# SLUDER v. ST. LOUIS TRANSIT COMPANY, Appellant.

**In Banc, June 1, 1905.**

1. **MUNICIPAL CORPORATIONS: Legislative Power: Delegation: Safety of Citizen.** The people may in their State Constitution or through the General Assembly in the exercise of its legislative power, when not restricted by the Federal or State Constitution, grant municipal corporations the power to pass all necessary ordinances for the protection of the safety of their citizens and their property. And such a delegation of power is no infringement on the maxim that legislative power cannot be delegated.

2. ————: **Regulating Street Cars.** The city of St. Louis, under its Scheme and Charter, has the power to regulate the use of

its streets and pass all ordinances needful for maintaining the peace, good government, health and welfare of the city. And by "regulate" is meant that it may control the mode of propelling cars within its limits, may prohibit the use of steam cars, and regulate the speed of cars.

3. ———: ———: Vigilance Ordinance: Contract or Police Regulation. The city, in enacting an ordinance requiring motormen and other persons in charge of streets cars to keep a vigilant watch for vehicles and persons on the track or approaching them, etc., was exercising its governmental police power to regulate the use of the streets, and not its proprietary right to contract for its municipal advantage as such.

4. ———: ———: ———: Distinction. There is no distinction between an ordinance regulating the speed of cars in and across streets, and one requiring the motorman to exercise a vigilant watch for vehicles and pedestrians on the track or moving towards it. Both are referable to the police powers of the city, and both are based upon the obvious necessity of compelling those who use dangerous and powerful agencies on public thoroughfares to be careful that they do not injure others who have an equal right there, and on the obvious fact that a car moving slowly can be more readily stopped to prevent a collision than one moving rapidly.

5. ———: ———: ———: Acceptance. The ordinance requiring motormen on street cars to keep a vigilant watch for pedestrians on the track or moving towards it, being an exercise of the police powers of the city, does not depend upon its acceptance by the street car company to make it obligatory upon it to obey it, but has the full force and effect of a law, and is an exercise of the city's governmental powers.

6. ———: Police Powers: Contracted Away. A city has no power to contract away its police powers or to bind itself not to exercise them whenever the public good or exigencies require it. And, hence, the right of a private citizen to recover damages for injuries resulting from the violation by a railway company of a police regulation in no way depends upon the acceptance by the company of that regulation.

7. ———: ———: Vigilance Ordinance: Acceptance: Violation: Civil Action. A pedestrian or traveler whose injuries are traceable to the negligent failure of a street car company to observe an ordinance requiring the motorman to keep a vigilant watch for pedestrians on the track or approaching it, and to stop the car in the shortest time possible, can maintain an action for damages against said company, whether said company has accepted said ordinance or not, and in such case it is not necessary

to either allege or prove the acceptance by the company of the ordinance. (Again overruling Fath v. Railroad, 105 Mo. 537, and the subsequent cases founded upon it.)

8. ———: ———: ———: **Actions Ex Contractu and Ex Delicto.** An action by a pedestrian or traveler in a vehicle who charges his injuries to the negligent failure of defendant's motorman to observe the requirements of an ordinance requiring motormen to keep a vigilant watch for pedestrians or vehicles on the track or approaching it and to stop their cars in the shortest possible time, etc., does not arise out of a breach of contract, but is founded on tort, just as is an action founded on an unlawful speed of the car, or failure to sound the gong.

9. **NEGLIGENCE: Viligance Ordinance: Higher Degree of Care Than Common Law.** An ordinance of a populous city which requires motormen in charge of street cars to keep a vigilant watch for all vehicles or pedestrians, either on the track or moving towards it, and on the first appearance of danger to them, to stop the car in the shortest time and space possible, does not exact a higher degree of care or diligence than the common law rule of ordinary care imposes, nor is it out of harmony with the general laws of the State.

10. ———: **Negligence of Plaintiff's Servant: Driver of Hired Carriage.** Plaintiff, a physician, contracted with a livery-stable keeper to carry him to see a patient, and the keeper sent the carriage by his servant as driver. Plaintiff told the driver to drive to a certain number, but gave him no other direction. The carriage was a close one and the night was dark. On the way the carriage, in attempting to cross a railway track, was struck by a street car. *Held*, that the negligence of the driver, if any, was not plaintiff's negligence. The driver was the servant of the livery-stable keeper, and the relation of master and servant did not exist between plaintiff and the driver.

11. ———: ———: ———: **Contributory Negligence: Concurring Negligence.** The negligence of the driver of a hired carriage, whether private or public, is not imputable to the person being carried, if he did not by some act or word encourage the driver's special act of rashness or carelessness which resulted in his injury. And, in such case, though his injuries may have resulted from the concurrent acts of negligence of the driver and of the motorman in charge of the street car with which the carriage collided, the railway company cannot excuse itself by imputing the driver's negligence to plaintiff as his contributory negligence.

12. ———: ———: ———: ———: **Sanctioning Driver's Negligence: Circumstances.** Where the hirer of a carriage gives no

Sluder v. Transit Co.

express sanction to the driver's conduct which contributed to his injury and was in no position to see or know the danger to himself, he is not chargeable with the negligence of the driver, on the ground that he himself was guilty of negligence in permitting the driver to go upon the railway track in face of obvious danger of a collision with a street car. Where the night was dark and the carriage a close one and the driver was proceeding in a slow trot on his journey, and the bell or gong of the car was not sounded, and the car was indifferently lighted, and when plaintiff first knew of its approach it was too close to avoid the collision, it cannot be said that he was guilty of negligence in sanctioning the driver's want of care.

13. ————: **Damages: Loss of Earnings: Physician.** The best evidence of a physician's loss of earnings is the actual value of his practice during the period of the previous year corresponding to that in which by the injury he was incapacitated for practice.

14. ————: **Speed of Car: Evidence.** The testimony of a physician as to the speed of a car is not incompetent simply because he is not an expert. His judgment may be of little weight, but its admission is not reversible error, especially when the objection thereto was not to its competency, and he had testified that he was familiar with the speed of cars.

### Per Marshall, J., in Separate Opinion.

1. **CIVIL ACTION: Delegation of Power.** The General Assembly cannot constitutionally delegate to a city power to enact a law that would create a right of civil action between citizens *inter sese*.

2. ————: ————: **Legislative Power: Meaning.** The term "legislative power," as applied to a city, means only the power to pass rules and regulations for the government of the municipality, the conduct of its officers, and the conduct of the citizens with respect to the municipality. In no sense does it mean, when used in reference to a municipality, the right in the municipality to enact a law that will be the rule of civil action between citizens *inter sese*.

3. ————: ————: **Scope of Police Powers Conferred.** The power conferred by the charter of St. Louis upon that city to regulate the use of its streets, to abate nuisances, to regulate the speed of cars, or the general welfare clause, does not confer upon the city the right to create a civil cause of action between citizens *inter sese*. The delegation to a municipality of a police power does not confer upon it the right to create a private right of civil action, but the city's power is limited to forbidding certain acts or offenses, and to punishing the violators of such regulations by fine, forfeiture or imprisonment.

Sluder v. Transit Co.

4. ———: **Police Regulation.** A right of action between citizens *inter sese* cannot arise out of a mere police regulation. The right of a city to regulate the actions of citizens between each other arises entirely out of the police power, but the right of civil action cannot arise out of police regulations. The power of St. Louis, under its charter, to regulate the use of the city's streets and the speed of cars, is a police power; and the same charter confers on the city the power to enforce such regulations by fines and forfeitures, but it nowhere confers on the city the right to enact a law that will afford the basis of a civil action between citizens *inter sese* for the violation of such regulations.

5. ———: ———: **Delegation: Exercise.** Even if the power to create a civil cause of action between citizens *inter sese* is conferred upon the city of St. Louis by its charter, or if such power can arise out of a police regulation, the city of St. Louis has never attempted to exercise that power. No intention to exercise that power can be gleaned from the Vigilant Watch Ordinance or any other ordinance enacted by the city. On the contrary, the article in which the Vigilant Watch Ordinance is found provides that any person or company failing to comply with the provisions of the article shall be guilty of a misdemeanor and fined, and the charter limits the rights of the city to enforce the police regulations it may enact to punishment by fines, penalties and forfeiture. *Held*, that the city in passing the ordinance did not attempt to create a private civil liability for failure to obey the ordinance, and the ordinance having prescribed a specific punishment for its violation, no other punishment can be inflicted therefor.

6. ———: **Negligence: Ordinance: Declaratory of Common Law.** The Vigilant Watch Ordinance, requiring all motormen on street cars to keep a vigilant watch for pedestrians or vehicles on the track or moving towards it and on the first appearance of danger to the passenger or vehicle to stop the car in the shortest time and space possible, is not simply declaratory of the common law, and even if it were it adds nothing to the common law. Nor is it within the power of a city to pass an ordinance that is simply declaratory of the common law.

7. ———: ———: ———: **Authorities From Other States.** Authorities from other jurisdictions upholding the doctrine that a citizen has a right to maintain an action for damages against a street railroad company for his injuries where its servants violated an ordinance requiring them to keep a vigilant watch for vehicles on the track, cannot properly be considered authority or precedent for a judgment for plaintiff in such a case in this State, because the laws in such other jurisdictions either expressly permit the delegation by the State of legislative

Sluder v. Transit Co.

power to a city, or the State statutes expressly give the right of action to citizens *inter sese* for wrongs arising out of a violation of municipal police regulations, or else such cases were not carefully considered, and are inaccurate, illogical and unscientific.

8. ———: **Ice on Sidewalk: Speed of Cars: Distinction.** No valid distinction can be made between police regulations, no matter what their purpose may be. The distinction made in Jackson v. Railroad, 157 Mo. 637, between a police regulation requiring abutting property-owners to remove ice from the sidewalk, and a police regulation regulating the speed of trains within the corporate limits, cannot be maintained. It cannot be maintained, on the ground that it is the duty of a city to keep its streets in a reasonably safe condition for travel thereon, that a failure to obey the ordinance to remove ice from the sidewalk affords no foundation for a civil action against the abutting property-owner by the person injured in consequence thereof, and that a violation of an ordinance regulating the speed of trains affords the person injured in consequence therof the right to a civil action against the railway company. The liability of the city is the same in each case. Ice on sidewalk is a nuisance, and excessive speed of cars is also a nuisance, and the power or duty of the city to require the abutting property-owner to remove the one or to regulate or stop the other arises out of its police power to suppress a nuisance. If a violation of an ordinance to remove ice from the sidewalk does not create the right in the pedestrian to recover from the abutting property-owner for personal injuries due to ice on the sidewalk, neither can a violation of a speed ordinance or the "Vigilant Watch Ordinance" give the injured party the right to recover from the railway company.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Morton Jourdan* and *Sears Lehmann* for appellant; *George W. Easley* and *Boyle, Priest & Lehmann* of counsel.

(1) The motions to elect should have been sustained. The petition blends causes of action arising *ex delicto* with causes of action arising *ex contractu*. The Vigilant Watch Ordinance could only be passed

under the power of the city to contract. Charter, art. 10, secs. 1, 2. It could not be passed under its power to legislate. Charter, art. 3, sec. 26; Fath v. Railroad, 39 Mo. App. 452; Fath v. Railroad, 105 Mo. 537; Senn v. Railroad, 106 Mo. 152; Moran v. Car Co., 134 Mo. 641; Byington v. Railroad, 147 Mo. 673; Murphy v. Railroad, 153 Mo. 253; Saunders v. Railroad, 153 Mo. 253; Holwerson v. Railroad, 157 Mo. 245; Anderson v. Railroad, 161 Mo. 411; Nellis on Street Railways, 306, sec. 10. The cases of Jackson v. Railroad, 157 Mo. 621, and Weller v. Railroad, 164 Mo. 180, 120 Mo. 655, were cases under a speed ordinance, and cannot be decisive of the principle here involved, and cannot be held to overrule the long line of cases specially decided on the Vigilant Watch Ordinance. A rule established and followed for a long series of years cannot be fairly overruled by inference or construction from rulings on questions involving entirely different propositions. There is a very broad distinction in the exercise of these two powers. One is public and general, the exercise of sovereignty; the other, private and proprietary. One legislative, the other contractual. State ex rel. v. St. Louis, 145 Mo. 572; Trust Co. v. Arkansas City, 76 Fed. 282; Power Co. v. Colorado Springs, 105 Fed. 1; Seltzenger v. Tamaqua, 187 Pa. St. 539; Schaub v. Lancaster City, 156 Pa. St. 362; Weston v. Syracuse, 158 N. Y. 274. If these positions are correct, then the plaintiff has joined in the same count a cause of action arising out of contract with two causes of action arising out of tort for common law negligence. The common law distinctions between actions *ex contractu* and *ex delicto* are in substance retained by our code. Sumner v. Rogers, 90 Mo. 329. The rule in this State is that such actions cannot be blended in the same count. Kendrick v. Railroad, 81 Mo. 521; Harris v. Railroad, 51 Mo. App. 128; Linnville v. Harrison, 30 Mo. 228; Jamison v. Copher, 35 Mo. 351; Ederlin v.

Judge, 36 Mo. 483; Southworth Co. v. Lamb, 82 Mo. 242. The fact that the injuries grew out of the same transaction would authorize the joining of them in the same petition, but they would have to be stated in separate counts, with a prayer for separate relief. 1 Burns' Anno. Code, sec. 413. (2) The court erred in permitting the plaintiff to testify as to the rate of speed of the car. He "no more than saw the car when the carriage was struck." He showed no experience or observation in regard to the speed of cars, and in the short length of time, only one or two seconds, during which the car was under his observation, he could not judge of its speed, except by mere inference and deduction from the facts stated by him. Koenig v. Railroad, 173 Mo. 720. (3) The court erred in permitting the plaintiff to testify to his earnings for the corresponding months of the previous year, for the purpose of showing the loss of earnings caused by the injury. (4) The court erred in refusing the instruction in the nature of a demurrer to plaintiff's evidence. Both the plaintiff and his driver were negligent in going upon the track in front of a moving car, without looking or listening for the same, and such action upon the part of both of them, and each of them, was the proximate cause of the injury, and without such negligence on their part, the accident would not have happened. It is the duty of the passenger, as well as the driver, when there is an opportunity to do so, to learn of danger, and avoid it if possible. Smith v. Railroad (Me.), 32 Atl. 967; Railroad v. McLeod, 29 So. 76; Brannen v. Railroad, 115 Ind. 115; Meenagh v. Buckmaster, 50 N. Y. S. 85; Bush v. Railroad, 62 Kan. 709; Dean v. Railroad, 18 Atl. 718; Township of Crescent v. Anderson, 8 Atl. 381; Hoag v. Railroad, 111 N. Y. 199; Roach v. Railroad, 21 S. E. 67; Koehler v. Railroad, 44 Fed. 574; Aurelius v. Railroad, 49 N. E. 857; Slater v. Railroad, 32 N. W. 264; Miller v. Railroad, 27 N. E. 339; Railroad v. Boyts, 45 N. E. 812; Brickell v. Railroad, 24 N. E. 449. (5)

The eighth instruction given on behalf of plaintiff is erroneous. It ignores the plea of the personal negligence of plaintiff in permitting the driver to go upon the track in the face of open and obvious danger. It ignores the proof in the record that the driver was subject to the orders and under the control of the plaintiff. We are not contending for the rule of "identification" founded upon the old case of Thorogood v. Bryan, 8 C. B. 114; nor for a rule, the effect of which "would be to make an innocent person answerable 'for the wrong act of another, over whom he has and exercises no control, and who is neither his servant nor his agent." Becke v. Railroad, 102 Mo. 550. Our contention is that the plaintiff shall be responsible for the act of one who was under his control and "subject to his orders." It seems clear in this State that if the driver, Cavanaugh, was subject to the orders and under the control of the plaintiff, plaintiff cannot, because of the negligence of Cavanaugh, recover. This question turns upon the fact of whether the plaintiff has the right to control the driver. If he had such right and failed to exercise it, he is responsible for the driver's act. If he had not such right, he is not liable. Becke v. Railroad, 102 Mo. 550; Dickson v. Railroad, 104 Mo. 504; O'Rourke v. Railroad, 142 Mo. 352; Borough of Carlisle v. Brisbane, 113 Pa. St. 552; Dyer v. Railroad, 71 N. Y. 228; Larkin v. Railroad, 85 Iowa 492; Roach v. Railroad, 21 N. E. 67; Mullen v. Owasso, 100 Mich. 103; Railroad v. Hogeland, 66 Me. 149; 1 Thomp. Neg. (2 Ed.), sec. 502, note 22; 2 Thomp. Neg. (2 Ed.), sec. 1621; Little v. Hackett, 116 U. S. 366; Follman v. City of Mankato (Minn.), 29 N. W. 317; Robinson v. Railroad, 66 N. Y. 11; Payne v. Railroad, 49 Iowa 523. If the plaintiff allowed the driver to take full control of the team, when he had the right and power to control and direct him, he is liable for the negligence of the person to whom he submitted such control. Holmes v. Mather (Eng. Ct. of Ex., 1875), 16 Am. Rep. 384; Sharrod v.

Railroad, 4 Ex. 580.  It was the duty of the plaintiff, as well as of the driver, to learn of the danger and avoid it if possible.  The hiring of the outfit did not excuse the plaintiff's failure to exercise care for his own protection.  Railroad v. McLeod, 29 So. 76; Smith v. Railroad, 32 Atl. 967; Miller v. Railroad, 128 Ind. 97; Hoag v. Railroad, 111 N. Y. 199.  The rule of non-imputability of the negligence of the driver, however, when no contract is shown does not absolve the passenger from ordinary care for his own safety.  The instruction now under discussion directed the minds of the jury to the sole inquiry whether the driver was negligent or not, and was "erroneous as calculated to mislead them." 1 Thomp. Neg. (2 Ed.), sec. 503; 2 Thomp. Neg. (2 Ed), sec. 1621.

*Campbell & Thompson* for respondent.

(1)    The court properly overruled appellant's motion to require respondent to elect, and properly permitted respondent to read in evidence the "Speed and Vigilant Watch" Ordinance, and properly instructed the jury that a failure by appellant to observe the requirements of said ordinance, was negligence.  It was not necessary for respondent to prove that appellant had accepted the provisions of said ordinance. Riska v. Railroad,180 Mo. 168; Jackson v. Railroad, 157 Mo. 621; Hutchinson v. Railroad, 161 Mo. 246; Weller v. Railroad, 164 Mo. 180; Wendler v. House Fur. Co., 165 Mo. 527; Gebhardt v. Railroad, 97 Mo. App. 373; McLain v. Railroad, 73 S. W. 909; Cox v. Railroad, 74 S. W. 858; Moore v. Railroad, 75 S. W. 699; Sepetowski v. Railroad, 76 S. W. 693; Kolb v. Railroad, 76 S. W. 1050.    (2)    The court properly gave the jury instruction 8, on behalf of plaintiff.  The case of Thorogood v. Bryan, 8 C. B. 114, has been expressly repudiated by the later English cases, by the Supreme Court of the United States, and, with possibly one or

two exceptions, by every State of the Union, in which the question has arisen, and especially has it been repudiated by the Supreme Court of Missouri. March v. Railroad, 78 S. W. 284; Becke v. Railroad, 102 Mo. 549; Dickson v. Railroad, 104 Mo. 491; O'Rourke v. Railroad, 142 Mo. 352; Bailey v. Railroad, 152 Mo. 462; Munger v. Sedalia, 66 Mo. App. 629; Profit v. Railroad, 91 Mo. App. 369; Johnson v. St. Joseph, 96 Mo. App. 663; The Bernina, L. R. 12 Probate Div. 58; Jones v. Liverpool, 14 Q. B. Div. 890; Donovan v. Laing, 1 Q. B. Div. 629; Quarman v. Burnett, 6 M. & W. 499; Dean v. Branthwaite, 5 Esp. 36; Sammell v. Wright, 5 Esp. 263; Little v. Hackett, 116 U. S. 366; Randolph v. O'Riordan, 155 Mass. 331; Huff v. Ford, 126 Mass. 24; Femmer v. Crisp Bros., 109 Iowa 455; Joslin v. Ice Co., 50 Mich. 516; Richardson v. Van Ness, 53 Hun 267; Weyant v. Railroad, 3 Duer (N. Y.) 360; Philips v. Railroad, 127 N. Y. 657; Crockett v. Calvert, 8 Ind. 127; Knightstown v. Musgrove, 116 Ind. 121; Herschberger v. Lynch, 11 Atl. 642; Bunting v. Hogsett, 139 Pa. St. 376; Quinn v. Construction Co., 46 Fed. 506; Railroad v. Railroad, 41 Fed. 316; Railroad v. Lapsley, 51 Fed. 800; Railroad v. Markens, 88 Ga. 62; Nesbit v. Town of Garner, 75 Iowa 314; Follman v. City of Mankato, 35 Minn. 522; Land Co. v. Mingea, 89 Ala. 521; State v. Railroad, 80 Me. 430; Railroad v. Hogeland, 66 Md. 149; Noyes v. Boscumen, 64 N. H. 369; Railroad v. Eadie, 43 Ohio St. 91; Railroad v. Kutoc, 72 Tex. 643; Railroad v. Cooper, 85 Va. 939; Railroad v. Steinbrenner, 47 N. J. Eq. 161. (3) The court properly permitted plaintiff to state the rate of speed at which the car was moving. It is not necessary that one be an expert to give such testimony. Walsh v. Railroad, 102 Mo. 582; Covell v. Railroad, 82 Mo. App. 186. (4) The averment in the petition that defendant had accepted the ordinance, was an unnecessary averment, and hence it was not incumbent upon plaintiff to prove such acceptance. Campbell v. Railroad, 121 Mo. 340;

Hartpence v. Rodgers, 143 Mo. 632; Palmer v. Tel. Co., 91 Mo. App. 115.

*George W. Easley* with *Boyle, Priest & Lehmann* on validity of Vigilant Watch Ordinance.

(1) "It is beyond the power of a municipal corporation by its legislative action directly to create 'a civil duty enforceable at common law,' for this is an exercise of power of sovereignty belonging alone to the State." Fath v. Railroad, 105 Mo. 545; Heeney v. Sprague, 23 Am. Rep. 508; Flynn v. Canton Co., 17 Am. Rep. 603, and note 616; St. Louis v. Ins. Co., 107 Mo. 92. An ordinance that merely prescribes a penalty for its violation does not create a liability in favor of a private individual. The only liability which attaches to its infraction is the penalty. Hartford v. Talcott, 48 Conn. 425; Keokuk v. Dist. of Keokuk, 53 Ia. 352; Kirby v. Boylston Market Co., 14 Gray 249; Flynn v. Canton Co., 40 Md. 312. The city has no authority to create any other liability than the penalty it is authorized to impose. Van Dyke v. Cincinnati, 1 Disney 532; Moran v. Car Co., 134 Mo. 631. It seems to be elementary law that an ordinance can neither create or release a civil liability. Horr & Bemis on Munic. Ord., sec. 7. (2) One of these three positions must be the true construction of this ordinance: 1, The ordinance is but declaratory of the common law rule of ordinary care, or, 2, that it requires more than ordinary care, or, 3, that it requires less than ordinary care. (a) If the first of these conclusions, that the ordinance but declares the rule of ordinary care, be reached, then the ordinance can give no addititional remedy. The common law, the general law of the State, must govern, and not the special or local ordinance. The ordinance adds nothing to and can take nothing from the general common law rule of ordinary care. Horr & Bemis on Ord., sec. 7; Jenks v. Williams, 115 Mass. 217. The ordinance is not de-

claratory of the common law rule of ordinary care, but on the contrary, it abolishes that rule and imposes a harsher one than ordinary care.  (b)  This ordinance is inconsistent with the general law of the State, and the law is well settled that: "Municipal by-laws must also be in harmony with the general laws of the State and with the provisions of the municipal charter. Whenever they come in conflict with either, the by-law must give way." 1 Smith on Mun. Corp., p. 468, sec. 499; and authorities collected in note 29. Indeed, the Municipal Assembly of St. Louis, by the very terms of its charter, is limited to the passing of ordinances "not inconsistent with the Constitution or any law of this State or of this charter." Charter, art. 3, sec. 26. Can it be doubted that this ordinance is inconsistent with the common law rule of ordinary care so long enforced in this State? 2 Dillon on Corp. (4 Ed.), sec. 727; 1 Smith on Mun. Corp., sec. 521. If the common law of the State fixes the care that the managers of street railways must exercise in operating them, then the ordinance gives no additional remedy. Horr & Bemis on Ordinances, sec. 7; Jenks v. Williams, 115 Mass. 217. An ordinance or by-law of a municipal corporation, not consistent with the general law of the State creating such municipality, is void. Robinson v. Mayor of Franklin, 34 Am. Dec. 625; Horr & Bemis, Mun. Ord., sec. 7. We have no contention to make that, as applied to a speed ordinance, the doctrine of the Jackson case is not sound in principle. Our contention is that the Vigilant Watch Ordinance is not an ordinance of the nature of a speed ordinance—that this suit is not "bottomed upon the violation of an ordinance which a city had the right to pass as a police regulation." This case is bottomed on an ordinance which undertakes to regulate the degree and kind of care that is to be exercised by the operators of street cars. That, we say, is a matter which is controlled by the common law of the State, and is not the proper subject of municipal

legislation.   If the ordinance is merely declaratory of the common law, then the common law controls, and not the ordinance.   If the ordinance requires more vigilance than the common law requires, and commands more prompt action upon the part of a motorman than does the common law, then the ordinance is not in harmony with the general law of the State, and is void.   The ordinance in question must be either declaratory of the common law of the State or more stringent in its requirements than the common law.   In either event, the ordinance does not create liability for anything more than the penalty prescribed.   Mason v. Shawneetown, 77 Ill. 533; Hayes v. Railroad, 111 U. S. 267; Fath v. Railroad, 105 Mo. 550.   The power to legislate upon the question of the care to be exercised in the operation of street cars has not been delegated by the Legislature to the city of St. Louis.

*Given Campbell* for respondent in reply.

(1)   The Fath case overruled the following decisions of the Supreme Court on that principle of law: Maher v. Railroad, 64 Mo. 275; Merz v. Railroad, 88 Mo. 677; Keim v. Railroad, 90 Mo. 321; Eswin v. Railroad, 96 Mo. 290; Schlereth v. Railroad, 96 Mo. 509; Grube v. Railroad, 98 Mo. 330; Kellny v. Railroad, 101 Mo. 77; Murray v. Railroad, 101 Mo. 236; Hanlon v. Railroad, 104 Mo. 387; Dickson v. Railroad, 104 Mo. 501. (2)   Since the decision in the Fath case, the Supreme Court has refused to follow it in the following cases: Brannock v. Elmore, 114 Mo. 55; Gratiot v. Railroad, 116 Mo. 450; Karle v. Railroad, 55 Mo. 483; Jackson v. Railroad, 157 Mo. 621; Hutchinson v. Railroad, 161 Mo. 246; Weller v. Railroad, 164 Mo. 180; Wendler v. House Furn. Co., 165 Mo. 527; Hirst v. Real Estate Co., 169 Mo. 194; Cox v. Railroad, 74 S. W. 859; Riska v. Railroad, 180 Mo. 168; Story v. Railroad, 83 S. W. 994; Reed v. Railroad, 80 S. W. 919.   (3)   The ordinance re-

quiring the motorman, etc., to keep a "vigilant watch,"
and on the first appearance of danger, to stop or check
his car in the shortest time, etc., has been held valid,
and its violation negligence *per se,* in the following re-
cent cases in this State: Meyers v. Railroad, 99 Mo.
App. 363; Kolb v. Railroad, 102 Mo. App. 143; Riska
v. Railroad, supra; Nagel v. Railroad, 104 Mo. App. 438;
Heinzle v. Railroad, 81 S. W. 848. (4) The great
weight of authority is with Missouri. 1 Shear. & Redf.
on Neg. (5 Ed.), sec. 13; 2 Dillon, Mun. Corp. (4 Ed.),
sec. 713; 1 Thomp. Law of Neg., secs. 10, 11. In the
following cases the violation of ordinances was held to
be negligence *per se:* Tobey v. Railroad, 94 Iowa 256
(speed of cars); Siemers v. Eisen, 54 Cal. 418 (un-
hitched horse); Allen v. Glenn, 87 Ga. 425 (ob-
structing street with engine more than five minutes);
Railroad v. Smith, 78 Ga. 694 (speed of trains at cross-
ing in city); Railroad v. Horton, 132 Ind. 189 (speed
of trains—cars); Railroad v. Des Lauriers, 40 Ill. App.
654 (speed of trains); Railroad v. Dunavan, 84 Ala.
141; Mueller v. Railroad, 86 Wis. 340 (stopping car in
middle of street); Railroad v. Robbins, 2 Colo. App.
313 (obstructing of street by train); Osborn v. Mc-
Masters, 40 Minn. 103 (statute requiring labeling of
drugs); Bott v. Pratt, 33 Minn. 323 (leaving horse un-
tied); Railroad v. McDonnell, 43 Md. 552 (speed ordi-
nance); Clements & Wf. v. Elec. Light Co., 44 La. Ann.
692 (insulated electric light wires); Railroad v. Dunn,
78 Ill. 197 (speed under circumstances negligence);
Railroad v. White, 84 Va. 498. (5) It is the duty of
the city by ordinance to lay down rules regulating the
use of the streets. This power is inherent in all cities.
Railroad v. Richmond, 96 U. S. 527. And the reason-
able rules laid down in the exercise of this power are
obligatory, and become duties, to be observed by all to
whom such rules are applicable, and a neglect to ob-
serve these rules is punished by a fine for the violation
of duty towards the city in its governmental capacity,

and is negligence, so far as any individual is damaged by their failure to comply with these rules and perform the duties enjoined thereby. The primary object of such ordinances is to promote the public welfare, by securing the safety of the citizen; and in this aspect they are remedial, while as to the penalty for violation in the shape of a fine, they are penal. Ins. Co. v. Needles, 113 U. S. 580.

GANTT, J.—This is an action for damages for personal injuries, caused by the collision of one of defendant's street cars with a livery carriage in which plaintiff was riding, at the crossing of McPherson avenue by Boyle avenue, on which last-named avenue the defendant company owned and operated a double-track street railway, in the city of St. Louis. Plaintiff recovered judgment in the circuit court for $6,000, and defendant appeals.

The petition in substance states that on or about the 27th day of December, 1901, about 7:15 o'clock in the evening of that day, the plaintiff, a physician, was being driven in a hired livery carriage west along McPherson avenue, a street running east and west, at its intersection with Boyle avenue, a street running north and south, in the city of St. Louis, and that the lamps on the said carriage were lighted and burning brightly; that at said time and place, and as such carriage in which plaintiff was riding was crossing defendant's south-bound or western street railway track, one of defendant's cars, propelled by electricity and south-bound on said track, with great speed, force and violence, struck and collided with said carriage, driving plaintiff's right arm into his floating ribs, fracturing the large bone of plaintiff's right fore arm, inflicting a body blow on plaintiff's body opposite the solar plexus, rendering plaintiff unconscious, and seriously hurting, bruising and crushing plaintiff's back and body.

"And plaintiff avers that at the time of receiving

said injuries, there was in force in the city of St. Louis an ordinance known as Ordinance 19,991 approved April 3, 1900, which ordinance defendant, long prior to the happening of the accident complained of, accepted and agreed to be bound by the terms and provisions thereof; that section 1760 of said ordinance in substance provides that all street cars after sunset shall be provided with signal lights; that no car shall be drawn at a greater speed than eight miles per hour, and that the conductor, motorman, gripman, driver or any other person in charge of each car shall keep a vigilant watch for all vehicles, either on the track or moving towards it, and on the first appearance of danger to such vehicle, shall stop the car in the shortest time and space possible.

"And plaintiff avers that though at the time of receiving said injuries aforesaid, it was long past sunset and dark, defendant had negligently failed to provide said car with signal lights, or to place a headlight on said car; that defendant's servants in violation of said provision of said ordinance were running said car southwardly on Boyle avenue towards McPherson, at the time said injuries were inflicted, and immediately prior thereto, at a careless, negligent and dangerously high rate of speed, to-wit, at a rate of speed far in excess of eight miles per hour; that defendant's servants in charge of said car, in violation of the provisions of said ordinance hereinabove referred to, negligently failed to keep a vigilant watch ahead for vehicles moving toward the track upon which said car was running, and negligently failed to stop or to attempt to stop or check the speed of said car in the shortest time and space possible, when they saw, or by the exercise of ordinary care or diligence could have seen the vehicle in which plaintiff was riding, in a position of danger, in time to have stopped said car before striking said vehicle, or to have so checked its speed as to have avoided said collision; and for another and further as-

signment of negligence, plaintiff states that at the time and place of receiving said injuries aforesaid, defendant's servants in charge of said car negligently failed to sound the gong or to give warning of said car's approach.''

The answer of the defendant was a general denial and the following defense:

"Second. Further answering, defendant says that whatever injuries plaintiff sustained, if any, were caused by his own negligence, in suffering and permitting the driver of said carriage to drive in front of the approaching car, when, by looking, he might have seen, or by listening he might have heard said car approaching, and have avoided the said accident.''

The reply was a general denial.

The facts developed in the trial were in substance the following:

On the evening of December 27, 1901, the plaintiff was and for some time prior thereto had been a practicing physician in St. Louis. On that evening he ordered a carriage from the Palace Livery Company, a livery stable owned by Charles H. Wilcox, in the city. Wilcox sent a two-horse hack or carriage in charge of one of his drivers, Thomas Cavanaugh, to plaintiff's residence, with directions to call for the doctor. When plaintiff got into the carriage he directed the driver to take him to a house on Westminster Place, the third from the corner of Forty-fourth Street, and gave no other orders.

The driver drove into McPherson avenue, which runs east and west, to Boyle avenue, which runs south, beginning at Olive street. The first street south of Olive street crossed by Boyle avenue is Westminster avenue. Boyle avenue is 37 feet wide from curb to curb, and McPherson is 40 feet in width. On Boyle avenue the defendant company has a double-track street railway from Olive street, which crosses both Westminster and McPherson as it goes south. At the

northeast corner of Boyle and McPherson there is a brick house facing south on McPherson avenue and standing back 30 feet from the north line of McPherson with its west side flush with the building line on the east side of Boyle avenue. On the opposite corner to the west or the northwest corner of Boyle and McPherson was a vacant lot, and on the southwest corner and fronting on McPherson was the residence of Mr. Jones.

It was a dark, windy night, a little foggy—a dark and cloudy night. The driver of plaintiff's carriage sat upon the top seat outside and on the front of the carriage and was driving west on McPherson avenue, on the north side thereof, and about seven or eight feet from the north curb stone, in a slow trot. The lamps on the carriage were lighted. Plaintiff sat on the back seat of the carriage and on the south side. The testimony of the plaintiff was to the effect, that as the carriage neared Boyle avenue a car passed going south, and the driver checked up a little and went forward in a little dog trot, and as he started across the track he heard the click of the wheels on the rails and heard the driver slap the horses, and he looked out of the north window of the carriage and saw a car at about what seemed to him fifty or sixty feet distant. He had hardly seen the car when it struck the carriage and he received the injuries of which he complains. Cavanaugh, the driver, testified that he was proceeding west on McPherson in a slow trot, on the north side of the street, and when he got within seven or eight feet of the east rail of defendant's tracks, a car passed south and then he looked both ways and saw no car coming and drove on to cross the tracks, and after he got on the west track he suddenly discovered another car coming south and only about 10 or 12 feet from him He tried to get out of its way but it came so fast he couldn't do so, and it struck his carriage, the front part of it. He was thrown from the carriage on to the vestibule of the

car, right at the feet of the motorman. He testified he looked north before attempting to cross and saw no car. No bell or gong was sounded. The only light on the street car was a single incandescent bulb with a reflector at the top of the car. The force of the blow cut the horses loose from the carriage and they ran west on McPherson avenue. The car drove the carriage across McPherson avenue to a position differently estimated from twenty to forty feet south of McPherson avenue, and the rear platform of the car when it stopped stood over the crossing on the south side of McPherson.

Two eye-witnesses testified in behalf of defendant, to-wit, young Masterson and the motorman, Middleton.

The motorman testified he first discovered the carriage when he was very close to the north line of McPherson avenue; that his car was about 5 or 10 feet from the north crossing when he first saw it. Asked if a carriage was 25 feet from the east line of Boyle avenue, going west, on the north side of McPherson avenue, how far down or from what point on Boyle avenue he could first see that carriage, he answered, "about fifteen feet" from the north crossing of McPherson avenue; that is, he couldn't see around the corner further east than that on account of the building on the corner; that the building was very close to the corner. Asked what there was to prevent him from seeing the carriage at a further distance than five or ten feet from it, he answered he was looking both ways to see if anything was approaching; that he had to look in more directions than one. There was liable to be carriages coming from other directions. He testified his car was running four or five miles an hour. He testified to seeing the boy (Masterton) on a pony about Westminster Place, a block north of McPherson. The boy was a little ahead of his car, riding south in a slow trot. He rang the gong for him near Westminster or a little south of it.

Masterson testified he remembered the incident of the car striking the carriage. He was riding a pony belonging to Watkins, a liveryman, going south on Boyle. He first noticed the car before he got to Westminster Place. He heard it come around the corner from Olive street on to Boyle. He was riding then close to the track but pulled away from it. The bell did not ring nor the gong sound after it passed Westminster. It did ring two or three times between Olive and Westminster. He looked back and the light on the car was very dim. He could see the light but it was very dim. The car was gaining speed all the time. It was going at a pretty good gait, about 15 miles an hour. "I was riding as fast as the pony would go." He testified he ran his pony off into McPherson avenue, and after the collision caught the two horses that were attached to the carriage and brought them back; that the car stopped on the south crossing of McPherson and Boyle avenues.

Plaintiff testified it looked as if it was going 20 to 25 miles an hour.

Mrs. Fenley says it was going very fast and she noticed no effort to check the speed.

Mitchell testified it was going nearly 20 miles an hour.

Cavanaugh says about 25 miles an hour.

On the other hand, the motorman and conductor placed the speed at 4 miles an hour.

The plaintiff, himself a physician, and Dr. Harvey G. Mudd testified to the nature of the injuries received and their evidence tended to show not only serious injuries causing much pain and suffering but a loss of time from his practice entailing a large pecuniary loss.

The instructions will be noted in the course of the opinion.

I. The first proposition advanced for a reversal of the judgment in this case is that the court erred in not requiring plaintiff to elect upon which assignment of negligence he would proceed to trial.

This contention is based upon the assumption that the petition blends causes of action *ex delicto* with causes of action arising *ex contractu*, and this in turn is predicated upon the principal insistence in this case, to-wit, that section 1760 of ordinance 19991, approved April 3, 1900, and commonly known as "the Vigilant Watch Ordinance," from the fact that it provides that the motorman or other employee propelling a street car in said city shall keep a vigilant watch for all vehicles either on the track or moving towards it and on the first appearance of danger to such vehicle shall stop said car in the shortest time and space possible, could only be passed under the power of the city to contract, and could not be passed under its police power to protect the lives, limbs and property of those using its streets in the pursuit of their lawful business, but could only control defendant and render it liable for its violation when it accepted it and agreed to be amenable to it, and hence a suit for its violation would be *ex contractu*, whereas the other acts of negligence were torts, either at common law or by statute or ordinance, and *ex delicto*.

In the solution of this contention fundamental principles must be invoked. That the people in the Constitution of the State or the Legislature in the exercise of its general legislative power, when not restricted by the Federal or State Constitution, may grant municipal corporations the power to pass all necessary ordinances for the protection of the safety of their citizens and their property is the settled law of this State, and such a delegation of power is no infringement of the maxim that legislative power cannot be delegated. [State v. Field, 17 Mo. 529; 1 Dillon on Munic. Corp., sec. 308, and cases cited; State ex rel. v. Francis, 95 Mo. 49; Morrow v. Kansas City, 186 Mo. 675; State ex rel. v. Murphy, 130 Mo. 10.]

The freeholders' charter of the city of St. Louis, adopted August 22, 1876, has all the force and effect of

a legislative charter. [Kansas City v. Oil Co., 140 Mo. 468; City of St Louis v. Gleason, 15 Mo. App. 25; Ibid v. Ibid, 93 Mo. 33.]

By section 1 of article 10 of the Scheme and Charter of St. Louis it is provided that "the Municipal Assembly shall have power by ordinance to determine all questions arising with reference to street railroads in the corporate limits of the city, whether such questions may involve the construction of such street railroads, granting the right of way, or *regulating or controlling them after their completion.*"

Under section 26, article 3, of said charter "The Mayor and Assembly shall have power within the city by ordinance not inconsistent with the Constitution or any law of this State or of this charter . . to establish, open, vacate, alter, widen, extend, pave or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves and public grounds and squares; . . . to construct and keep in repair all bridges, streets, sewers and drains and *to regulate the use thereof,*" etc.

Elsewhere the charter gives the city power to declare and abate nuisances and pass ordinances for the general welfare.

Thus we find that the people of Missouri by their organic law have expressly delegated to the city of St. Louis the power to regulate the use of its streets and pass all needful ordinances expedient in maintaining the peace, good government, health and welfare of the city. [State ex rel. v. Murphy, 130 Mo. 22; Railroad v. Kirkwood, 159 Mo. 239; sec. 20, art. 12, Const. of Mo. 1875.]

Discussing section 26 of article 3 of the St. Louis charter, in St. Louis v. Western Union Telegraph Co., 149 U. S. l. c. 469, the Supreme Court of the United States said: "It is given power to own and establish streets, to improve them as it sees fit, and to regulate

their use, paying for all this out of its own funds. The word 'regulate' is one of broad import. It is the word used in the Federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance No. 11,604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used."

Judge Dillon in his Municipal Corporations (4 Ed.), vol. 2, sec. 713, says: "Resulting from the power over streets, and to protect the safety of citizens and their property, municipal corporations may control the mode of propelling cars within their limits, may prohibit steam cars and regulate the rate of speed."

It is not then to be questioned that, under the comprehensive grant in its charter, the city of St. Louis has the police power to regulate the use of its streets by street car companies for the protection of the public which uses them for the paramount purpose for which they are established, to-wit, for travel thereon, and so long as they are streets the city itself cannot appropriate them even to another public use which would wholly or practically deprive the public of the right to travel thereon. [Lockwood v. Railroad, 122 Mo. 86; Knapp & Co. v. Railroad, 126 Mo. 26.]

Looking, then, to the ordinance which requires of street railway companies that its motormen and other servants propelling their cars on the streets *keep a vigilant watch* for vehicles and persons on their tracks or approaching them, it is too clear for argument that in enacting said ordinance it was exercising its governmental police power under its authority over and to regulate the use of said streets, and not its proprietary right to contract for its municipal advantage as such. That St. Louis and the other cities of this State have the power to regulate the speed of trains

running along or across its highways has been asserted by this court on numerous occasions, and this is expressly conceded by defendant, both in the briefs of its counsel and in the oral argument.

This question was thoroughly examined and so decided in Jackson v. Railroad, 157 Mo. 621. In that case Burgess, J., collates the decisions of this court from an early period down to the promulgation of the opinion in that case and reference only need be made to that case for them.

Counsel earnestly labor to show that there is a distinction between an ordinance regulating the speed of cars in and across the streets, and one requiring the motorman to exercise a vigilant watch for vehicles and pedestrians, especially children, on the track of such street railways or moving toward it, but it is obvious that both spring from the same power to regulate the use of the streets for the protection of the traveling public, their lives, limbs and property, and both alike fall within the recognized domain of a police law. In Bluedorn v. Railroad, 108 Mo. l. c. 443, Judge Black, speaking for this Court in Banc, said: "Our attention has not been called to any provision of the charter of the city of St. Louis which gives the city power, in *terms,* to regulate the *speed* of railroad trains; but the charter, among other things, gives the mayor and assembly power to regulate the use of streets; to regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health; to declare, prevent and abate nuisances on public or private property and the causes thereof; and to pass all such ordinances as may be expedient in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures. It is well to bear in mind that laws and ordinances regulating the speed of railroad trains *are police regulations purely.* [Grube v. Railroad, 98 Mo. 330; Knobloch v. Railroad,

31 Minn. 402; Railroad v. Deacon, 63 Ill. 91; Thorpe v. Railroad, 27 Vt. 140.]''

Indeed, Judge REDFIELD says: ''We should enter-tain no doubt of the right of the municipal authorities of a city or large town to adopt such an ordinance *without any special legislative sanction,* by virtue of the general supervision which they have over the police of their respective jurisdiction.'' [2 Redfield on Railways (5 Ed.), 577-8.]

But it is unnecessary to look for support for a proposition so universally conceded as that ordinances regulating the speed of trains in cities are referable to the police power, and that such regulation is based upon the obvious necessity of compelling those who use powerful and dangerous agencies on the public thoroughfares to be careful that they do not injure others who have an equal right to the use of the highway, and the obvious fact that a train of cars moving slowly can be much more readily stopped to prevent a collision than one moving at a rapid speed. On identically the same principle is the ordinance for a vigilant watch based.

Since the adoption of electricity and cables as the motive power the danger to pedestrians and those traveling in vehicles on the streets is greatly multiplied, and it is a wise and salutary provision that requires the motormen in charge of these ponderous and rapidly moving cars to carefully watch that they do not run over pedestrians, old men, women and children who have an equal right to the use of the streets, and such an ordinance falls as clearly within the police power as does the speed ordinance.

Being then the exercise of the police power, the ordinance does not depend upon the acceptance of the street car companies to make it obligatory upon them to obey it, but it is a municipal law enacted by the city in its governmental capacity, of which all who come within its scope are bound to take notice, and it has the full

force and effect of law within the limits of the corporation. [Jackson v. Railroad, 118 Mo. 218, 219.]

Being a police power it was and is not within the power of the city to contract it away or to bind itself not to exercise it whenever the public good or exigencies require its exercise. This is so universally recognized that it is unnecessary to refer to precedents to establish it.

But, say counsel, even if this be conceded, the power is coupled with a power to prescribe limited punishment by fine, penalty or imprisonment for disobedience only, and no civil liability to any third party injured by a violation of the ordinance can result therefrom. This contention finds support in the decisions in Fath v. Railroad, 105 Mo. 537; Byington v. Railroad, 147 Mo. 673; Murphy v. Railroad, 153 Mo. 252. All the subsequent cases are bottomed upon the *Fath* case in which, although unnecessary to the decision of the case, *arguendo,* it was held "that it is beyond the power of a municipal corporation by its legislative action directly to create, 'a civil duty enforceable at common law;' for this is an exercise of the power of sovereignty belonging alone to the State."

In Jackson v. Railroad, 157 Mo. 635, et seq., BURGESS, J., reviewed all the authorities upon which the doctrine above announced in the Fath case was bottomed, and showed conclusively that those decisions had reference to that class of cases in which private persons sought to avail themselves of a violation of ordinances which the city had passed for its own protection and for which the city was primarily liable, such as the ordinances requiring owners to remove ice and snow upon the sidewalks adjoining their premises and ordinances of a similar character, and pointed out that those cases were different from those founded upon the violations of ordinances enacted under the police power for the protection of lives and property, which all cities in this State have the right to pass as police regula-

tions, and which relate primarily to the duty of those whose conduct they regulate for the benefit of persons traveling on the streets, who have a right to rely upon the observance of such ordinances.

The line of demarcation is clearly drawn between the two classes of ordinances in the Jackson case, and is abundantly sustained by authority in other States, and by the text-writers.

Thus, in 1 Shearman & Redfield on Negligence (5 Ed.), sec. 13, it is said: "The violation of any statutory or valid municipal ordinance, established for the benefit of private persons, is of itself sufficient to prove such a breach of duty as will sustain a private action for negligence, brought by a person belonging to the protected class, if the other elements of actionable negligence concur."

In Bott v. Pratt, 33 Minn. 323, cited with approval by this court in Bluedorn v. Railroad, 108 Mo. 439, and Jackson v. Railroad, 157 Mo. 636, the distinction was clearly drawn and emphasized, and the authorities throughout the Union collected and distinguished. The opinion in Jackson v. Railroad, 157 Mo. 621, however, answers the contention of defendant fully on this point. As to the criticism of the opinion in that case as *obiter* on this proposition, the contrary is the fact. In that case the learned counsel for defendant in that case in the second paragraph of their brief made the point that "the petition did not state a cause of action because it did not show the existence of a civil duty owed by defendant to deceased and enforcible against it at common law," and there was no allegation of a contract between defendant and the city to comply with the regulations pleaded. [Jackson v. Railroad, 157 Mo. loc. cit. 624.]

Not only was the point fairly and ably presented, but counsel for defendant were right in assuming that the *obiter* in the Fath case was to be followed, and that since the street car company in St. Louis could not be

held amenable to the police regulations of said city then no reason existed why railroad companies in other cities should not avail themselves of this exemption for violations of like police regulations, unless forsooth they had signified their consent to be amenable thereto. So that counsel were not only justified in making the point, but we would have been wanting in respect to counsel had we not considered the point and decided it.

It is urged also that, until the Jackson case, no one had questioned the Fath case, and that this court had followed the latter case is several decisions. This is true, but we duly considered these decisions, and because in our opinion they were not in harmony with an unbroken line of decisions from Karle v. Railroad, 55 Mo. 476, down to Prewitt v. Railroad, 134 Mo. 615, in all of which it had been held that the running of a railroad train through the corporate limits of a city in excess of the speed prescribed by ordinance was negligence *per se* and a cause of action resulted to any person injured by such violation of the statute. [*Vide* cases cited in Jackson v. Railroad, 157 Mo. loc. cit. 641.] Jackson v. Railroad, 157 Mo. 621, has received the approval of this Court in Banc in Weller v. Railroad, 164 Mo. 180, and the principle upon which it stands has been reiterated in Hutchinson v. Railroad, 161 Mo. 246, and Wendler v. People's House Furnishing Co., 165 Mo. 527, and Cox v. Railroad, 174 Mo. 605, and we see no reason for regarding it longer as an open question in this State.

Fath v. Railroad, 105 Mo. l. c. 545, and the subsequent cases of Byington v. Railroad, 147 Mo. 673; Murphy v. Railroad, 153 Mo. 252; Sanders v. Railroad, 147 Mo. 411; Holwerson v. Railroad, 157 Mo. 245, which announce the doctrine that no cause of action can arise to a person injured from the violation of such an ordinance as this, should no longer be followed. Since the promulgation of the opinion in Jackson v. Railroad, 157 Mo. 621, the St. Louis Court of Appeals has fol-

lowed it in various cases. [Gebhardt v. Transit Co., 97 Mo. App. 373; McLain v. Railroad, 100 Mo. App. 385; Moore v. Railroad, 95 Mo. App. 728; Sepetowski v. Railroad, 102 Mo. App. 119.]

There was no misjoinder in uniting the several grounds of negligence in one petition. The failure to keep a vigilant watch out for vehicles was not a cause of action arising out of contract and it was not necessary to prove the company's acceptance of the ordinance.

This brings us to the next insistence of defendant, to-wit, that the ordinance exacts a higher degree of diligence and care than the common law rule of ordinary care and imposes a harsher one, and for that reason is not in harmony with the general laws of the State, and hence void. This objection to the ordinance in question was urged by the same learned counsel in the St. Louis Court of Appeals in Sepetowski v. Railroad, 102 Mo. App. 119, but that court held that "properly construed it is but declaratory of the common law duty of corporations operating street railways in populous cities," and that conclusion is in harmony with the decision of this court. [Riska v. Railroad, 180 Mo. 168.]

As was said by Judge Sherwood, in Lamb v. Railroad, 147 Mo. loc. cit. 204, that although there was no ordinance of the city of Pleasant Hill, regulating the speed of engines and requiring the ringing of the bells on the engine and although in his opinion the eighty rods statute did not apply in such cities, "but while we say this, at the same time we say that outside of the statute, and under the principles of the common law, a railroad corporation would not perform its full duty of ordinary care, unless those employed on a switching engine, engaged in its customary avocation, should ring its bell, or if necessary, take any other precaution adapted to the exigency which, like the mercury in the

thermometer, determines to what degree prudence shall rise in order to reach the mark of ordinary care.''

The same principle is enunciated in Holden v. Railroad, 177 Mo. 456, wherein the rule announced in Hicks v. Railroad, 64 Mo. l. c. 439, that ''in running through towns and cities, and over public crossings, they are expected to be more careful than at other places where not so likely to injure persons or property,'' is approved, as was the rule announced in Frick v. Railroad, 75 Mo. l. c. 609, to the effect that ''a less degree of vigilance will ordinarily be required between the streets of a town or city, than will be required at a street crossing, or when running longitudinally in a street.'' Indeed, so apparent is the duty of the driver or motorman in charge of cars moving on the rapid transit lines maintained by street car companies, to keep a constant and vigilant lookout for persons and vehicles that a failure to do so would be regarded as negligence and a failure to exercise ordinary care in the absence of an ordinance. Certainly such an ordinance is not out of harmony with anything in the Constitution or laws of this State.

But learned counsel urge that if it does not require *more* than ordinary care, then there is no excuse for its existence.

It is a novel argument against the validity of a statute that it conforms to the laws of the State and requires the same prudence that the general law of the State exacts, particularly so when the charter of the city commands that its ordinances shall be in harmony with the Constitution and laws of the State. We can see no merit in this contention.

Our conclusion is that this ordinance was the exercise of a police power clearly vested in the city for the protection of the lives and property of its citizens on its streets; that it exacts no more than ordinary care, when the conditions and circumstances to which it is applicable are considered, and that a breach of its

requirements is negligence; that the acceptance or agreement of the defendant company was not at all necessary to give said ordinance the binding force of a valid municipal law within the limits of the city.

II.   A second insistence is that the eighth instruction given in behalf of plaintiff was erroneous.   That instruction is in the words following:

"8.   The court instructs the jury that the carriage and horses used by the plaintiff at the time of the accident belonged to a livery-stable keeper, and if they further believe from the evidence that the driver of the carriage was an employee of the livery-stable keeper, and that the plaintiff hired said carriage, horses and driver from said livery-stable keeper, and exercised no control over the movements of said carriage or the handling of said horses, except to give the driver his destination, then the jury are instructed that the driver was not the servant of the plaintiff, and although they may find from the evidence that the plaintiff's said injury was contributed to by the negligence or want of ordinary care of said driver, without any co-operation on the part of the plaintiff, yet the jury cannot impute such negligence of said driver to the plaintiff, and if they find that the injury was caused both by the negligence of defendant as explained in the foregoing instructions and the negligence of said driver, they will yet, nevertheless, find for the plaintiff."

The objection to this instruction is twofold, first, that the driver in the circumstances detailed in evidence was the servant of and under the control of plaintiff, and therefore the driver's negligence was plaintiff's contributory negligence; second, that it ignores plaintiff's own personal contributory negligence in failing to look out for his own safety, in permitting the driver to drive into obvious danger.

As to the first, counsel for defendant do not insist

upon the doctrine of Thorogood v. Bryan, 65 Eng. Com. Law (8 M. G. & S.) 114, wherein it was ruled, "that a passenger upon the vehicle of a common carrier who sustains an injury which is the result of the concurrent negligence of those in charge of such vehicle and third persons is so *identified* with the former as to be charge-able with their negligence in an action against the lat-ter, and therefore only entitled to recover damages from his former carrier." The doctrine of that case was afterwards repudiated by the Court of Appeals in Eng-land in the case of "The Bernina," 12 L. R. Prob. Div. (1887) 58, and other cases, and by this court in Becke v. Railroad, 102 Mo. 548, et seq., in which BRACE, J., reviewed all the English and American decisions on this point. The decision in Becke v. Railroad has been repeatedly followed by this court. [Dickson v. Railroad, 104 Mo. 491; O'Rourke v. Railroad, 142 Mo. 352.] And such has been the uniform ruling of our Courts of Appeals. [Hunt v. Railroad, 14 Mo. App. 160; Keitel v. Railroad, 28 Mo. App. 657; Munger v. Sedalia, 66 Mo. App. 629; Profit v. Railroad, 91 Mo. App. 369.] The distinction claimed between the Becke case and this is, that the driver in this case was sub-ject to the orders of plaintiff and if plaintiff had the right to control the driver and failed to exercise it, he is responsible for the driver's act.

It is well that we determine at the outset what rela-tion plaintiff and the driver Cavanaugh bore to each other.

We think it is plain that Dr. Sluder contracted with Hickox, the owner of the Palace Livery Stable, to transport him to the residence of his patient on West-minster avenue near 44th street. In the performance· of his part of the contract of conveyance, Wilcox sent his carriage and driver. The carriage and horses were in the control of Wilcox through his agent and driver all the time it was occupied by plaintiff, just as much so as if Wilcox himself had driven it, and it is a confus-

ion of legal principles to say that under such circumstances the relation of master and servant existed between plaintiff and Wilcox or that of principal and agent—nor was such relation created between plaintiff and Cavanaugh, Wilcox's driver. The evidence shows that plaintiff ordered the carriage to take him to the house on Westminster and when the driver came, simply told him where he was to go and *gave no other directions, and assumed no control over Cavanaugh as to the management of his team or the route he was to take.*

This identical question arose in Randolph v. O'Riordon, 155 Mass. 331, and the Supreme Court of that State held the relation of master and servant was not created by a mere contract like this for a conveyance. Said the court: "Whether the hack and driver were hired at a public stand *or of a private person* could make no difference, nor whether the party furnishing them was engaged in the business of a common carrier of passengers *or not.* It would not do to say that one who buys a passage from New York to Liverpool sustains the relation of master to the officers and crew and owners of the steamer on which he embarks. No more would it do to say that one who buys conveyance for his own person or his family from place to place within the same city, or to an adjoining city, thereby assumes the relation of master to a servant or liability for his acts uncommanded and uninterfered with by him." The court then proceeds to show that Thorogood v. Bryan, upon which the defendant rested in that case, stood upon "indefensible ground," citing Little v. Hackett, 116 U. S. 366-375, and many other cases.

In Railroad v. Steinbrenner, 47 N. J. Law 161, it appeared that plaintiff hired a coach and horses with a driver from one Merkins to take his family on a particular journey. In the course of the journey, in crossing a railroad track, the coach was struck by a passing

train and the plaintiff was injured. In his action against the company for damages, it was held, that the relation of master and servant did not exist between plaintiff and the driver and that the negligence of the driver co-operating with that of the persons in charge of the train which caused the accident was not imputable to the plaintiff as contributory negligence to bar his action; that, while a passenger in a hired coach might by words or conduct at the time so encourage a special act of rashness or careless driving as to commit an act of negligence which would bar a recovery, in order to impute contributory negligence to the passenger it must arise from his own conduct, and the negligence of the driver alone without some co-operating negligence on his part could not be imputed to the passenger in virtue of the simple act of hiring.

Such is the settled doctrine in England. In Quarman v. Burnett, 6 M. & W. 499, the defendants were the owners of a carriage and were accustomed to hire horses and coachmen of a job mistress for a day or a drive for which the job mistress charged and received a certain sum. The defendants generally had the same horses and always the same coachman. As a gratuity they gave the coachman two shillings for each drive, and provided him a livery hat and coat. He had driven the defendants one day and on his return after the defendants had alighted, the coachman left the horses and carriage unattended. The horses ran off and ran against the plaintiff's chaise, threw him out and injured him and damaged the chaise. Plaintiff sued the owner of the carriage, but it was held the driver was not the servant of the owner of the carriage, but of the job mistress who alone was liable for his negligence.

Without citing further authorities we think the instruction was correct in advising the jury that the driver in this case was not the servant of Dr. Sluder

so as to make the latter guilty of the driver's contributory negligence, if any.

We have examined with care the long list of cases cited by defendant to sustain its proposition that the demurrer to the evidence should have been sustained on the ground that while the driver's negligence is not imputable to plaintiff, yet the plaintiff was guilty of negligence in permitting the driver to go upon the track in the face of obvious danger. Without reviewing each of these cases it must suffice to say that each of them contains some element of express sanction by the injured party of the driver's negligent conduct or some circumstance showing the plaintiff was in a position to see or know the danger to himself and made no effort to protect himself. In almost every one of them the plaintiff was driving in an open vehicle with the driver in broad daylight and in nearly all of them the accident occurred at steam railroad crossings, known to the plaintiff to be notoriously dangerous.

In no one of them are the facts such as appear in this case. Dr. Sluder was riding in a *close* carriage on a *dark winter night*. There was no evidence that the driver was a negligent or reckless driver, and that such a fact was known to Dr. Sluder.

On the contrary, the evidence was that the driver was proceeding in a slow trot until he was about to cross Boyle avenue when he checked his team and the first knowledge Dr. Sluder had that they had reached the railroad crossing was the click of the tires on the rails and then looking through the carriage window to the north he discovered a car rapidly bearing down on his carriage and not over fifty feet distant. Almost instantly it struck the carriage and inflicted his injuries. To say that he was guilty of co-operating negligence in sanctioning the want of care of the driver, if considering the darkness of the night, the failure of the servants of the company to sound the gong or ring the bell and the very indifferent light on the car, he was

negligent, would be to disregard all the reasons upon which the rule that the negligence of the driver is not to be imputed to the passenger is based. The facts of this case do not bring it within the reasoning of any of the cases which are cited as exceptions to the rule itself.

Plaintiff was not outside with the driver where he could see and advise the driver as to the crossing. He was not situated so that he could have jumped out of the carriage after discovering his peril on the approach of the car. From the inside of the close carriage he could not even have communicated with the driver and directed him to stop or to rush his team after he saw the car or by the exercise of ordinary care under the conditions then confronting him could have seen it in time to have averted his injury. [Railroad v. Boyts (Ind.), 45 N. E. 812; Bricknell v. Railroad, 120 N. Y. 290.] We find no evidence *of negligence* on the part of the plaintiff which would have justified an instruction driving him to a nonsuit.

As to the instruction 8 it was dealing with one question, to-wit, whether the negligence of the driver was imputable to plaintiff, and it was not erroneous, nor was there any error in refusing defendant's instructions which made plaintiff responsible for the driver's negligence. There was no evidence even tending to show any contributory negligence on the part of the plaintiff and hence it was not error to decline to tender that issue to the jury, in any other way than to advise them he was not to be charged with any negligence of the driver in view of the facts developed on the trial. [Railroad v. Markens, 88 Ga. 62.]

III. The point is also made that the court erred in permitting plaintiff to testify to his earnings for the corresponding months of the previous year. The evidence on this point is as follows: "Q. What were you earning at that time, Doctor? A. I was earning for

the month of December, I think, about $2,000 to the month. For the months corresponding of the previous year to the time I was disabled, I earned $3,500.'' To this counsel for defendant objected. ''The Court: Wait a minute, Doctor. You have answered the question?'' Ans. ''There is no way except by comparing with previous times.'' ''Question. Was that an average month?'' Objection. No ground stated. ''The Court: He can answer.'' Exception saved. ''Ans. That was the best month of the year. December, January and February always are.''

It will be observed no objection was made when the question which elicited the answer was asked. No motion was made to strike it out. The only exception saved was to the question, ''was that an average month?'' The evidence had previously shown that the Doctor was incapacitated to practice his profession eleven and one-half weeks, and we have heard no reason stated why it was not competent for the physican himself to testify what his actual monthly practice averaged him. It was not guess work, but actual knowledge to which he was testifying. It was not remote, but the value of his profession to him for the immediate month during which he was disabled and we agree with him that the best evidence was the actual earnings of the month in which he was injured.

IV. As to his testimony as to the rate of speed at which the car was running he was competent to testify to what he saw, not as an expert. His judgment may under the circumstances have been of little weight, but the objection to it went to its weight and not its competency. At all events, in view of the actual physical facts not controverted by defendant, its admission is no ground for a reversal of the judgment. He had testified he was familiar with the speed of trains running twenty or twenty-five miles an hour and that in his judgment it was running about that fast.

We have considered all the propositions advanced

for a reversal of the judgment and in our opinion there was no reversible error committed on the trial, and the judgment is affirmed.

*Brace, C. J., Burgess, Valliant, Fox* and *Lamm, JJ.,* concur; *Marshall, J.,* dissents in a separate opinion.

### SEPARATE OPINION.

MARSHALL, J.—I am unable to concur in all that is said in the majority opinion in this case, and feel that it is my duty to express my reasons therefor, not with any idea that it will do any particular good, at this time, but for the purpose of placing myself on record with respect to the main question discussed and decided in this cause.

There are many principles of law stated in the majority opinion, with which I fully concur, and for the purpose of clearly defining my attitude in this case, I deem it best, at the outset, to state wherein I concur and wherein I dissent.

The following principles of law have passed into axioms, and I wish distinctly to be understood as fully agreeing to them. They are as follows:

First, I agree that the charter of St. Louis has all the effect of a legislative charter.

Second, I agree that under the charter of St. Louis that city has the power to control the use of its streets; to abate nuisances; to regulate the running or speed of railroads inside of the corporate limits, and under the general welfare clause, to pass such ordinances, not inconsistent with the provisions of the charter or the laws of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city, "and to enforce the same by fines and penalties, not exceeding $500, and by forfeitures not exceeding $1,000."

Third, I agree that the city cannot appropriate the streets to any use that will practically deprive the public of the use of the streets.

Vol 189 mo—10

Fourth, I agree that the State may lawfully delegate a portion of its police powers to the city, and the city may exercise that power within its corporate limits.

Fifth, I agree that the city ordinance under discussion in this case, being section 1760 of the municipal code of St. Louis, commonly known as the "Vigilant Watch Ordinance," is a valid police regulation, and within the power of the city to enact, and as such, is binding upon all individuals and corporations using the streets, and needs no acceptance by any such persons or corporations to make it binding as a police regulation.

Sixth, I agree that the city cannot contract away its police power, or bind itself by contract not to exercise it.

Seventh, I admit that there is an irreconcilable conflict between the case of Karle v. Railroad (55 Mo. 476) and the cases following it, and the case of Fath v. Railroad (105 Mo. 545), and the cases following it, and that for some unexplainable reason these two lines of cases have been running along through the reports when they could not be reconciled, and when they both depend upon the same principles of law, and cannot logically be distinguished or differentiated.

But I do not think any of these matters are at all decisive of the question involved in this case.

On the other hand I deny—

First, that the Legislature of the State could constitutionally delegate to the city power to enact a law that would create a right of civil action between citizens *inter sese*.

Second, I deny that the power conferred by the charter of St. Louis upon the city to regulate the use of its streets; to abate nuisances; to regulate the speed of railroads, or the general welfare clause, confers upon the city the right to create such a civil cause of action, between citizens *inter sese*.

Third, I deny that such a right of action, between citizens *inter sese,* can arise out of a mere police regulation.

Fourth, I deny that even .if such a power is conferred by the charter of St. Louis, or if such power can arise out of a mere police regulation, the city of St. Louis has even attempted· to exercise such a power. On the contrary, I assert that no such a law has been enacted by the city, and that no intention so to do can be properly gleaned from the Vigilant Watch Ordinance or from any other ordinance that the city has enacted.

Fifth, I deny that the discussion of the question here involved was unnecessary to the decision of the case of Fath v. Railroad (105 Mo. 545)', and assert that if such discussion was unnecessary to the decision of that case, it is likewise unnecessary to the decision of the case at bar, for the two cases are identical in this respect.

Sixth, I deny that the Vigilant Watch Ordinance is simply declaratory of the common law, and assert that if it is, it adds nothing to the common law; and moreover assert, that it is not in the power of the city to pass an ordinance that is simply declaratory of the common law.

Seventh, I deny that the cases from other jurisdictions cited in the majority opinion herein and in Jackson v. Railroad (157 Mo. 621), can be properly considered authority or precedent for the decision of this case, because the laws in such other jurisdictions either expressly permit the delegation by the State of legislative powers to a city, or the State statutes expressly give a right of action to citizens *inter sese* arising out of a violation of a municipal police regulation, or else such cases were not carefully considered, and are inaccurate, illogical and unscientific. Moreover, I assert that under the Constitution and laws of this State, and the decisions of this court, the power to make a

law that will afford a right of civil action between citizens *inter sese,* cannot be delegated to a municipality.

These general principles, and this separation of those things in the majority opinion which I agree to and which I dissent from, reduces the discussion of this case to a narrow compass.

The discussion naturally divides itself into three principal considerations, to-wit:

First, can the Legislature delegate to a city the power to enact a law that will afford the basis of a civil action between citizens *inter sese?*

Second, can such a right of action arise out of a mere police regulation? And subsidiary to this inquiry, can there by any logical, reasonable and scientific distinction made between the violation of the the Vigilant Watch Ordinance and a violation of the ordinance requiring citizens to remove ice from the sidewalk in front of their property, or a violation of any other police regulation?

Third, if the city of St. Louis has such a power under its charter, has it enacted any such law, or has it simply enacted police regulations and prescribed penalties for the violation thereof, and are such penalties the sole remedy afforded by such regulations, and have the courts the right to punish the offender in any other manner than is prescribed by such regulations?

I.

Can the Legislature delegate to a city the power to enact a law that will afford the basis of a civil action between citizens *inter sese?* Section 1 of article 4 of the Constitution prescribes that, "The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled, 'The General Assembly of the State of Missouri.' "

This court, in "Opinion of Supreme Court Judges on Township Organization Law" (55 Mo. 298), said:

"It is admitted, I think, by all, that this power to legislate and enact laws cannot be delegated by the General Assembly, to any other body; or, in other words, there can be no statute or law passed without the will of the General Assembly of the State, expressed in the legal form.

In State ex rel. v. Wilcox (45 Mo. 1. c. 461), this court said: "It is undoubtedly true that under our form of government laws must be enacted by the legislative bodies to which the legislative power is committed by the Constitution. The legislators cannot divest themselves of the responsibility of enacting laws by a reference of the question of their passage to their constituents."

The American and English Ency. Law (2 Ed.), vol. 6, p. 1020, lays down the doctrine as follows: "To the legislative department of government is confided the authority, under the constitution, or frame of government, to make, alter or repeal laws. . . . It is a doctrine frequently reiterated by the courts that the functions of the Legislature must be exercised by it alone and cannot be delegated."

The same author says: "The term 'legislative power,' means the power or authority, under the constitution or frame of government, to make, alter or repeal laws." [18 Am. and Eng. Ency. Law (2 Ed.), 822.]

"The legislative power is defined as that of one of the three great departments into which the powers of government are distributed—legislative, executive and judicial—which is concerned with enacting or establishing, and incidentally, with repealing laws." [State ex rel. v. Hyde, 121 Ind. 26; Evansville v. State ex rel., 118 Ind. 441.]

This doctrine is so axiomatic in the law of this State that further citation of authority is unnecessary.

Section 4151, Revised Statutes 1899, prescribes, that, "The common law of England, and all statutes

and acts of Parliament made prior to the fourth year of the reign of James I., and which are of a general nature, not local to that kingdom, which common law and statutes are not repugnant to or inconsistent with the Constitution of the United States, the Constitution of this State, or the statute laws in force for the time being, shall be the rule of action and decision in this State, any law, custom or usage to the contrary notwithstanding.''

Blackstone defines law to be, ''A rule of civil conduct prescribed by the supreme power in a State, commanding what is right and prohibiting what is wrong.'' [1 Chitty's Blackstone, p. 29.]

In Badgley v. St. Louis (149 Mo. 122), this court had before it the validity of the section of the charter of St. Louis which provides that whenever the city shall be liable in an action for damages, by reason of the unauthorized and wrongful acts, or of the negligence, carelessness and unskillfullness of any person or corporation and such person or corporation shall be liable to an action on the same account by the party injured, such person shall be joined in the suit against the city for damages, and no judgment shall be rendered against the city unless judgment is also rendered against such person. It was noted in the case that said provision of the charter was not in conflict with any express statute of the State. Yet it was held that the provision of the charter was unconstitutional because it prescribed a different rule of civil action in the city of St. Louis from that which obtains in any other part of the State.

In St. Louis v. Howard (119 Mo. 41), the validity of the provision of the city charter which prohibited the establishment or operation of any stone quarry, brick kiln, soap factory, slaughter house, bone or rendering factory within the distance of three hundred feet of any dwelling house, built or inhabited before such opening, location or erection, without the consent,

in writing, of the owner, and occupant or occupants of every such house, was involved. And it was held that the provision as to the consent of the owner or occupant of such house, was an unconstitutional delegation of power to the people.

In St. Louis v. Russell (116 Mo. 248), the city ordinance prohibiting the erection of a livery stable on any block without the consent of the owners of one-half of the ground in such block, was held to be an unconstitutional delegation of legislative power.

There are two kinds of powers which may be conferred upon a municipality. The first is commonly called a legislative power, and the second a police power. The term "legislative power," as so applied to a city, however, means only the power to pass rules and regulations for the government of the municipality, the conduct of its officers, and the conduct of the citizens with respect to the municipality. In no sense does the term "legislative power," when used in reference to a municipality, mean the right to enact a law that will be a rule of civil action between citizens *inter sese*. The power to regulate the actions of citizens between each other, that may be exercised by the municipality, arises entirely out of the police power, and a right of civil action cannot arise out of a mere police regulation.

Thus the power of St. Louis, under its charter, to regulate the use of its streets; to abate nuisances; to regulate the running and speed of railroad cars, or other vehicles; or to pass ordinances for the peace, good health and welfare of the city, is a mere police power; and paragraph 14 of section 26 of article 3 of the city charter gives the city only the power to enforce such regulations by fines and penalties not exceeding $500, and by forfeitures not exceeding $1,000, and nowhere confers, or attempts to confer, upon the city the right to enact a law that will afford the basis

of a civil action between citizens *inter sese*, for the violation of such regulations.

Thus, it is obvious that under the Constitution and laws of this State it is beyond the power of the Legislature to delegate to a city the power to create such a right of civil action, and it was clearly beyond the power of the board of freeholders, who framed the charter of St. Louis, to confer such a power upon the municipal assembly. I deem further discussion of this branch of the case unnecessary.

## II.

Can such a right of action arise out of a mere police regulation? And subsidiary to this inquiry, can there be any logical, reasonable and scientific distinction made between a violation of the Vigilant Watch Ordinance and a violation of the ordinance requiring citizens to remove ice from the sidewalk in front of their property, or a violation of any other police regulation? Tiedeman, in his excellent work on State and Federal Control of Persons and Property, vol. 1, sec. 1, says, "The private rights of the individual, apart from a few statutory rights, which when compared with the whole body of private rights are insignificant in number, do not rest upon the mandate of municipal law as a source."

Blackstone defines the police power to be, "The due regulation and domestic order of the Kingdom, whereby the inhabitants of a state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations." [4 Blackstone Com., 162.]

Tiedeman sums up the power as follows: "It is to be observed, therefore, that the police power of the government, as understood in the constitutional law of the United States, is simply the power of the govern-

ment to establish provisions for the enforcement of the common, as well as civil, law maxims, *sic utere tuo ut alienum non laedas.*" [Tiedeman on State, etc., Control, p. 4.]

The controlling and underlying principle governing all police regulation is, that in all organized society certain natural rights must be modified, or abridged, so that there may not be a conflict between citizens in their intercourse with each other. Inasmuch as no citizen can compel any other citizen to forego the exercise of his natural rights, the power is held to exist in the government to prescribe such regulations as will prevent such conflicts, and such police regulations contemplate a penalty for the violation thereof, and are almost universally accompanied with such penalties.

Police regulations are rules which the government prescribes for the conduct of the citizens, and the citizen is answerable to the government for the violation thereof. This power is very different from a legislative power. Under the latter is embraced all the power of the State, to prescribe rights and duties of citizens *inter sese,* and to afford remedies to the citizens for all violations of such laws by any other citizen.

Under the Constitution of this State, all legislative power is vested in the General Assembly, and cannot be by it delegated to a municipality. Because of the recognized distinction between a mere police regulation and a legislative power, it is held, almost universally, that the former can be delegated, while the latter cannot.

The Legislative powers conferred upon municipalities in this State are limited to the right of the municipality to enact rules for the government of the city, its officers, and of the citizens with respect to the government.

Regulations concerning the use of streets; the erection of buildings; the licensing and carrying on of various kinds of business; the abating of nuisances; the

opening and operating of stone quarries, slaughter houses, soap factories, vitriol factories, etc.; the establishment of a system of weights and measures; the manufacturing and sale of articles of food; the prohibiting the running of animals at large; regulating the speed of vehicles, and requiring the establishment of signals therefor; prohibiting the construction of wooden buildings; prescribing precautions against fire; providing for the peace, good government, health and welfare of the city, and the citizens thereof, are mere police regulations, and the power to enact the same is usually conferred upon municipalities. But it was never contemplated that a violation of any such regulations should afford a right of a civil action by one person against another. On the contrary, it was not only contemplated, but is expressly provided, in nearly every instance, that the power conferred in this respect, upon a municipality, can be enforced only by a fine or forfeiture.

In Norton v. St. Louis (97 Mo. 537), this court held that the ordinance of the city of St. Louis which required the owner of the abutting property to remove ice from the sidewalk in front thereof, was a mere police regulation, and that a violation thereof afforded no basis for a civil action by the person injured against the abutting owner.

But in Jackson v. Railroad (157 Mo. l. c. 637), a distinction was drawn between a police regulation, requiring such abutting owner to remove ice from the sidewalk, and a police regulation regulating the speed of railroad trains within the corporate limits. And it was there said, that the distinction consisted in this, that it is the duty of the city to keep its sidewalks reasonably safe for travelers, and that it is responsible in damages for failure so to do, and that the city had no power to shift this responsibility upon an abutting owner without his consent, "because in no sense a police regulation;" while the regulation of speed of

trains within the corporate limits of the city is a police regulation. In other words, the distinction was stated to be, that where the duties enjoined are due to the municipality or public at large, a violation of the police regulation affords no foundation for such a civil action, but that where the police regulation is intended to regulate the action or conduct of persons, citizens or corporations, among themselves, a violation thereof will afford a basis for such an action.

I do not think such a distinction can logically or scientifically be drawn.

Both such regulations arise out of the police power of the city. The power of the city to compel a property-owner to remove ice from the sidewalk in front of his property, derives its force solely from the police power of the city. So the power to regulate the action and conduct of citizens *inter sese,* so that each may have proper regard for the rights of the other, arises solely from the police power of the city. The principle upon which the liability of a city for failure to remove snow and ice from sidewalks rests, is that the snow and ice constitute a nuisance, and that it is the duty of the city to remove nuisances from its streets. The principle upon which speed ordinances or vigilant watch ordinances rests, is that trains that are run at a high rate of speed or without proper care, amount to a nuisance on the street. The duty to prevent or remove such nuisances rests upon the city. The duty can no more be evaded or shifted in the one case than in the other. Under its police power the city can require the abutting owner to remove the snow and ice from the sidewalk, and can prevent the railroad from running its trains in such manner as to be a nuisance. But the power of the city to punish a violation of such regulations is limited, both by the general law and by the charter of the city, to a fine or penalty or a forfeiture.

It is worthy of note, in this connection, that the distinction made in the Jackson case, supra, between the

liability of one person to another for the violation of
the ordinance requiring the one to remove ice from the
sidewalk, and the violation of the speed ordinances of
the city, is said to exist only as to such instances of
municipal police regulation.    In none of the other re-
spects, wherein a city is authorized to enact police reg-
ulations, is such a distinction made.    The same section
of the charter which confers upon the city the right to
regulate the use of its streets, confers upon it also  all
the power it has to enact any other police regulation,
and in none of the other instances in which the city is
authorized to enact such regulations, does the duty pro-
vided for, rest, primarily, or at all, upon the city, but
they all relate to matters concerning the conduct and
action of the citizens *inter sese,* and are enacted purely
upon the principles underlying the rule of *sic utere tuo
ut alienum non laedas.*

Thus, the city is given power in the same section to
regulate the erection of buildings; the carrying on of va-
rious kinds of business; the abating of nuisances; the
opening and operating of stone quarries, slaughter
houses, soap factories, vitriol factories, etc.; a system
of weights and measures; the manufacture and sale of
articles of food; the running of animals at large; the
erection of wooden buildings; the taking of precautions
against fires, and for the peace, good government
health and welfare of the city and the citizens thereof.
None of these are duties, or matters, devolving upon
the city in its corporate capacity.    They are all matters
which affect the citizens of the city in their relation to
each other.    And the city as a political body has no
other interest in the matter, and no other duty cast up-
on it, except to control the conduct of the citizens
among themselves.    All such matters stand exactly up-
on the same footing, and rest exactly upon the same
legal principles as the regulating of the speed of rail-
roads or vehicles on the streets or in the city.    If the
violation of one of such police regulations affords the

basis of a civil action by one who is injured by such violation, then the violation of any of them affords the same right.

I am totally unable to comprehend upon what rule of construction a legitimate, scientific and logical distinction can be made between a violation of any such regulations and the violation of an ordinance which requires the abutting owner to remove ice from the sidewalk in front of his premises. In my judgment, no such distinction exists, and if the violation of one of such police regulations affords a right of action by the person injured, then the violation of any other affords a similar right.

The majority opinion in this case is expressly based upon the proposition that the "Vigilant Watch Ordinance" is a police regulation, and that the city had no power, except its police power, to enact such an ordinance.

The doctrine that the violation of the speed ordinances of the city constitutes negligence, *per se,* and affords a right of civil action to the person injured, was first announced in this State, in Karle v. Railroad (55 Mo. 476). The subject was not discussed or scientifically considered in that case, and no authority or precedent in the law was cited in support of it. The only thing said about it in that case was in passing upon instructions given by the lower court to that effect, and this court disposed of the whole subject by simply saying, "The three instructions which declared a failure of the defendant to observe the regulations of the city ordinance in relation to the speed of trains, keeping head-lights and ringing the bell, to be negligence *per se,* were undoubtedly correct. These were violations of an *express law,* and of course amounted to negligence."

Thus it will be observed that the court treated a municipal regulation as an "express law," without, in any manner, discussing the power of the Legislature to delegate to the city the right to enact a law to that

effect.  The court, in that case, did not place its decision upon the ground that the ordinance was a police regulation, nor did it attempt to justify the position taken on the ground that a mere police regulation can give rise to a right of civil action.  On the contrary, the court assumed, unwarrantably I believe, that it was within the power of the city to enact a "law" on that subject; or otherwise stated, that the city had a legislative power in that respect.

Karle v. Railroad, supra, was followed by Wyatt v. Railroad  (55 Mo. 489), and the ordinance was there also treated as a law passed by competent legislative authority.  The law was not held to be justified by, or properly referable to, the police power of the city; nor was the subject in hand  discussed in that case.

The Karle case was also followed by Norton v. Ittner (56 Mo. 352), but there was no discussion of the principles involved, further than to say, "Negligence may be asserted as a matter of law, where there has been a breach of law, or a city ordinance, as in Karle v. Railroad (55 Mo. 476)."

The rule laid down in the Karle case was quoted in Stoneman v. Railroad (58 Mo. l. c. 505), but the subject was not discussed, and the validity of such an ordinance was not involved in that case, because the action was brought under the State statute in reference to the killing of animals.

The Karle case was also cited in Doss v. Railroad (59 Mo. l. c. 37), but not upon the proposition here involved, for there was no such question in that case. The same is true of Meyers v. Railroad (59 Mo. 230).

The Karle case was also cited in Evans v. Railroad (62 Mo. l. c. 58), but the point here under discussion was not involved in that case, for the reason that the negligence there complained of was a violation of the State statute requiring the ringing of the bell or the sounding of the whistle.

The Karle case was also referred to, and cited up-

on other points, in Maher v. Railroad (64 Mo. l. c. 276), but there was no question of the violation of the city ordinance involved in that case, and there was no discussion of that subject in that case.

The same is true of Kelly v. Railroad (70 Mo. 604).

The Karle case was also cited in Zimmerman v. Railroad (71 Mo. l. c. 484), but not upon the point under discussion, and there was no city ordinance involved in that case, but the negligence complained of was a violation of the State statute.

. The Karle case was also cited in Yarnall v. Railroad (75 Mo. l. c. 584), but not upon the point here involved, and there was no city ordinance involved in that case, the negligence complained of being common law negligence.

The Karle case was also cited and followed in Bowman v. Railroad (85 Mo. l. c. 538), but there was no discussion of the subject beyond what was said in the Karle case, and the question was not otherwise discussed or decided.

The Karle case was also cited in Sullivan v. Railroad (88 Mo. l. c. 183), but that was an action for common law negligence, and there was no ordinance involved, and the subject, therefore, was not discussed. The reference, in that case, was to other principles decided in the Karle case.

Karle v. Railroad was cited and followed in Keim v. Railroad (90 Mo. l. c. 321), but there was no discussion of the subject, and the ordinance was not attributed to the police power of the city, but on the contrary, the opinion expressly stated that the ordinance had been accepted by the defendant.

The Karle case was cited in Muehlhausen v. Railroad (91 Mo. 346), but upon a different point from that here involved. There was no city ordinance involved in that case, but the violation of the State statute regulating the running of cars was involved.

The Karle case was also cited in Dunkman v. Rail-

road (95 Mo. 244), but not upon the point here involved, for there was no such question in that case.

The same is true of Hudson v. Railroad (101 Mo. l. c. 29).

The Karle case was also cited and followed in Hanlon v. Railroad (104 Mo. l. c. 387), but the subject was not discussed further than to say, "It is well settled that a failure to observe such reasonable and wholesome requirements constitutes negligence in itself;" and Karle v. Railroad, supra, and Murray v. Railroad (101 Mo. 236), were cited as authority for the proposition.

In the last case cited, the only thing said of the ordinance was, "The evidence shows beyond all controversy that there was no flagman at the crossing, and this violation of the ordinance was negligence *per se.*"

The Karle case was also cited in Spillane v. Railroad (111 Mo. 565), but not upon the question here involved, and the question was not discussed in that case.

The Karle case was also cited in Prewitt v. Eddy (115 Mo. l. c. 302), but not upon the point here involved, that case going off on the humanitarian doctrine.

The Karle case was also cited in Mitchell v. Bradstreet Co. (116 Mo. 247), but not upon the point here involved, for there was no such ordinance involved in that case.

The Karle case was also cited and followed in Gratiot v. Railroad (116 Mo. l. c. 463), but there was no further discussion of the subject than to say, that a violation of the city ordinance regulating the speed of trains is negligence *per se.*

The Karle case was also cited in Moore v. Railroad (126 Mo. l. c. 278), but not upon the point here involved, for there was no such ordinance involved in that case.

The same is true of Scott-Force Hat Co. v. Hombs (127 Mo. 403).

Karle v. Railroad, supra, was also cited in Lloyd
v. Railroad (128 Mo. 1. c. 607), but the negligence
charged in that case was a violation of the State statute
requiring the bell to be rung or the whistle sounded,
and no such ordinance was involved.

In Eswin v. Railroad (96 Mo. 295), the whole dis-
cussion of the subject consisted of this: "A violation
of the ordinance is, as we have often said, negligence
*per se.* [Keim v. Railroad, 90 Mo. 314, and cases
cited.]"

In Schlereth v. Railroad (96 Mo. 1. c. 515), the ques-
tion was not discussed further than to say, "And it is
the established law of this court that the violation of
municipal ordinances which regulate the rate of speed,
etc., of trains, is negligence *per se.* [Keim v. Railroad,
90 Mo. 314, and cases cited.]"

In Grube v. Railroad (98 Mo. 1. c. 336), it was said:
"There can be no doubt that the State has power to
regulate the speed of trains, and to make other reason-
able regulations for the movement of locomotives and
trains of cars in cities, towns and other crowded places.
Such regulations concern domestic government, and
are but the exercise of the police power of the State.
[Railroad v. Deacon (63 Ill. 91); Railroad v. State (51
Miss. 137); Knobloch v. Railroad (14 Am. & Eng. R. R.
Cases 625); Tiedeman on Lim. of Police Powers, sec-
tion 194.] The power to enact such regulations may.
be delegated to cities and towns. [Merz v. Railroad,
(88 Mo. 672.)]"

In Kellny v. Railroad (101 Mo. 1. c. 77), the subject
was disposed of by saying that, "the violation of mu-
nicipal ordinances which regulate the speed of trains
is negligence *per se,* and that every person on the pub-
lic street in a municipality has a right to presume that
the railroad will obey such ordinances."

Drain v. Railroad (86 Mo. 574), was based upon a
violation of a city ordinance, but the validity of such

ordinance was not discussed or decided.   The questions discussed by this court in that case, were contributory negligence, and excessive damages.

Dickson v. Railroad (104 Mo. 491), was based partly upon a violation of a city ordinance.   No question appears to have been raised as to the validity of the ordinance. But on the contrary, its validity seems to have been assumed by counsel (l. c. 498), and the only remark made, by this court, on the subject was, ''The failure to station a watchman at the crossing, when required by ordinance, has been held negligence *per se*'' (l. c. 501).

I have thus reviewed, at painful length, the cases in which the doctrine, under discussion, has been referred to by this court prior to the case of Jackson v. Railroad (157 Mo. 621).

The doctrine was first announced in the Karle case, and as above pointed out, it was there treated as an ''express law,'' which it was assumed, without argument, that the city had the power to enact.   No attempt was made in that case to place it upon the police power of a city.   That case is the foundation for the whole doctrine, and the subsequent cases reviewed herein have simply followed it.   In fact, counsel do not seem to have questioned the power of a city to enact a law on the subject.   Like the court, they seem to have assumed that the city possessed such a legislative power.

It is only lately that counsel and the courts have awakened to an appreciation of the principles involved in the question.

The first case, in which the suggestion was made that the city had the right, under its police power, to enact such a regulation, was Merz v. Railroad, 88 Mo. 672.   This was followed by a like suggestion in Grube v. Railroad, 98 Mo. 330.   In Prewitt v. Railroad, 134 Mo. 615, the matter was disposed of by saying: ''The power of a city under its charter to pass such an ordinance as a police regulation is not questioned.''

Prior to the Merz case, it seems to have been assumed that such regulations were enacted in pursuance to a legislative power. In Grube v. Railroad (98 Mo. l. c. 336), it was expressly held that the State had the power to enact laws regulating the speed of trains, etc. It was said in that case that such regulations are an exercise of the police powers of the State, and that such police powers may be delegated to cities and towns, and Merz v. Railroad (88 Mo. 672) was cited as authority.

In the Merz case, 2 Dillon on Municipal Corporations, section 713, and 2 Redfield on Railways, 577-8, were quoted. Both of said authors, in the sections quoted, were discussing the police powers of a city to regulate the running of trains, and both stated the universally admitted doctrine, that a city has such a police power. But neither author, in the sections quoted, was dealing with the question here in hand. The question of whether a civil right of action could arise out of a violation of such a police regulation, was not discussed or considered by those authors in the sections quoted.

In Grube v. Railroad, the same condition existed, and it was assumed, without discussion, that the violation of a police regulation would afford a civil right of action between citizens *inter sese.*

In Bluedorn v. Railroad (108 Mo. l. c. 444), this court, in speaking of such city ordinances, said, ''It is well to bear in mind that laws and ordinances regulating the speed of railroad trains are police regulations purely,'' and cited Grube v. Railroad, supra; Knobloch v. Railroad (31 Minn. 402); Railroad v. Deacon (63 Ill. 91); Thorpe v. Railroad (27 Vt. 140); Dillon on Municipal Corporations, and Redfield on Railways, above referred to, and held that a city had the authority, under its general police power, to enact such ordinances. There was no other or scientific discussion of the proposition in that case.

Thus it appears that prior to the decision in Jackson v. Railroad (157 Mo. 621), there had been no at-

tempt made to discuss or decide the question, here involved, upon legal principles. The Jackson case was decided by Division No. 2 of this court.

Hutchinson v. Railroad (161 Mo. 255), was decided by this court, in banc, prior to the decision of the Jackson case, and it was held that a violation of the city ordinance limiting the rate of speed of a railroad train, "was negligence *per se,* and if it was the cause of the accident, the defendant was liable, unless the deceased contributed to the result by her own negligence. This proposition has been so often and so elaborately discussed and demonstrated, and as a rule of law so often declared, by this court, that it is now only necessary to restate it and cite some of the decisions in which it is discussed."

And some of the cases hereinbefore digested, beginning with Karle v. Railroad, supra, and ending with Prewitt v. Railroad (134 Mo. 615), were cited, but there was no discussion of the principles according to scientific rules in any of those cases.

Jackson v. Railroad, supra, was cited in Weller v. Railroad (164 Mo. l. c. 205), and the matter was disposed of in a single sentence as follows: "It is asserted that plaintiff's first instruction is erroneous in that it based her right of recovery upon the violation of an ordinance of the city, but as the right to maintain this action upon that ground was recognized by this court in its former opinion, and, the question expressly ruled adverse to that contention in the recent cases of Jackson v. Railroad (157 Mo. 621), and Hutchinson v. Railroad (161 Mo. 246), it is unnecessary to say more upon that subject."

Wendler v. People's House Furnishing Co. (165 Mo. 527), was an action for damages caused by falling into an elevator shaft on the inside of the defendant's place of business. There was a city ordinance relied on, which required elevator shafts to be provided with a railing or guard to prevent persons from falling into

them. The validity of the ordinance was not discussed further than to say, "the validity of the ordinance in question, the obligation of defendant to obey it, and his liability for failure so to do, are propositions of law clearly established." [1. c. 541.] But it was said that the provisions of the ordinance had not been read in evidence, and were therefore not properly in the case, and that, "the whole ordinance might have been dropped out of this case entirely without affecting its merits."

Thus it appears that neither prior to the Jackson case, nor subsequent thereto, until this case, was there any attempt made in any of the cases cited to discuss the question whether the violation of a municipal police regulation can afford a basis for a civil action between citizens *inter sese*. And this case is the first case in which that question has been attempted to be discussed, upon legal principles, by this Court In Banc. For this reason I do not consider that the cases referred to have settled the proposition.

At the outset of this discussion, therefore, I desire to repeat that, in my judgment, a municipality has complete power to enact police regulations, limiting the speed and regulating the running of trains, as also to enact other police regulations necessary to the peace, health, and welfare of its citizens, and the like. But I think the power of a city, under its police power, is limited to punishing a violation of such police regulations by fines, forfeiture and imprisonment, and cannot afford the basis of a right of civil action between citizens among themselves.

I have already indicated that, in my judgment, no valid distinction can be made between police regulations, no matter what their purpose may be, and that the distinction made in Jackson v. Railroad, supra, between ordinances requiring abutting owners to remove ice from the sidewalk, and ordinances regulating the speed of trains, or the manner of running trains, is untenable, for both derive their whole power and au-

thority from the police power.  For this reason I think
that the decision in Norton v. St. Louis (97 Mo. 537),
and in Jackson v. Railroad, supra, cannot both stand
together.

The decision in Jackson v. Railroad is based upon
the case of Karle v. Railroad, and the other cases here-
inbefore analyzed in this State, and upon the doctrine
laid down in 2 Dillon on Municipal Corporations (4
Ed.), 713, and 2 Redfield on Railways (5 Ed.), 578,
which, as above pointed out, relate only to the police
power of a city to regulate the speed of trains, and do
not pertain to the question of whether such ordinances
can afford a basis of civil action between citizens *inter
sese,* and upon the following cases in other jurisdict-
ions, to-wit:  Knobloch v. Railroad (31 Minn. 402);
Railroad v. Deacon (63 Ill. 91); Thorpe v. Railroad (27
Vt. 140); Railroad v. Haggerty (67 Ill. 113); Mason v.
Shawneetown (77 Ill. 533); Hayes v. Railroad (111 U.
S. 228); Shearman and Redfield on Negligence (5 Ed.),
sec. 13; Railroad v. Young (81 Ga. 397); Railroad v.
Curtis (87 Ga. 416); Railroad v. Stebbing (62 Md. 504);
Correll v. Railroad (38 Ia. 120); Railroad v. Hensil (70
Ind. 569); Railroad v. Reidy (66 Ill. 45); Railroad v.
Voelker (129 Ill. 540); Piper v. Railroad (46 N. W.
165); Railroad v. Terry (42 Tex. 451); Bott v. Pratt (33
Minn. 323); Wright v. Railroad (4 Allen 283); and the
majority opinion in the case at bar  cites no other au-
thority upon the proposition.

A short review of the cases cited from other juris-
dictions, and the doctrine stated by the text-writers re-
ferred to, is necessary and pertinent to the inquiry at
hand.

Knobloch v. Railroad (31 Minn. 402), was an act-
ion for damages for killing the plaintiff's cow.  One of
the acts of negligence relied on  was a violation of a
city ordinance limiting the rate of speed to four miles
an hour.  The power of a city to enact such an ordi-
nance, and the question, whether it was a law enacted

under legislative power or simply a police regulation, was not discussed or decided. The defense was, solely, that the ordinance was void, because it was unreasonable, and in restraint of trade. No other point was made or decided in that case. The case, therefore, is of no value in determining the question here under discussion.

Railroad v. Deacon (63 Ill. 91), was an action for damages for killing the plaintiff's horse. An ordinance limiting the speed of railroad trains, and providing a penalty for the violation thereof, was relied on. The defense was that the ordinance impaired the contract of the defendant's charter. It was held that the charter was accepted subject to the power of the city to pass police regulations; that the Legislature had granted power to cities and towns to pass ordinances regulating the speed of cars, and that the State statute provided that railroad companies should be liable for all damages sustained by running trains at a greater rate of speed than is permitted by the ordinance of any city or town.

Thus it appears that in that State there is a State statute which makes a violation of a city speed ordinance a cause of civil action in favor of the party injured. There was no other discussion or decision of the question in that case.

Hayes v. Railroad (111 U. S. 228), was an action for damages for failure to fence the railroad tracks as required by the city ordinance. The court pointed out that there was a general law of the State which conferred upon cities the power to require railroads to fence their tracks, and made a company failing to comply with the city ordinance liable for all damages to cattle and horses, "in like manner and extent as under the general laws of this State, relative to the fencing of railroads," and also a State statute which requires a railroad to keep a flagman at street crossings, and to provide protection against injury to persons and prop-

erty. In discussing the question whether an action for a violation of such regulations would lie in favor of a third person, the Supreme Court of the United States referred to Atkinson v. Newcastle Waterworks Co. (L. R. 2 Exch. Div. 441), which qualifies the broad doctrine stated by Lord CAMPBELL in Couch v. Steel (3 E. & B. 402) and accepts the limited doctrine announced by Lord CAIRNS, ''That whether such an action can be maintained must depend on the 'purview of the legislature in the particular statute, and the language which they have here employed,' '' and held that, under the State statute, and the city ordinance passed pursuant to legislative authority, such a right of action would lie in that case.

It is manifest that that case cannot be taken as affording support to the Jackson case, or the majority opinion herein, for there is no such State statute in this State as there is in Illinois, and under the decisions in this State, the Legislature cannot delegate its legislative power to a city. In this connection, it is proper to note that in Couch v. Steel (3 E. & B. 402) Lord CAMPBELL held, that an act of parliament, which made it a duty of a ship-owner to keep a proper supply of medicine on hand, and provided a specific punishment for the breach of that duty, afforded, also, a private right of action for such breach.

Atkinson v. Newcastle Waterworks Co. (L. R. 2 Exch. Div. 441), was an action for damages against the waterworks company for a breach of its statutory duty to keep its pipes, at all times, charged with water, at a sufficient pressure to extinguish fire, in consequence of which the plaintiff's premises were burned. The statute prescribed a penalty for a violation of the duty imposed, and it was held that its liability was limited to that penalty, and that the statute gave no right of action to the plaintiff, and the rule laid down by Lord CAMPBELL in Couch v. Steel was questioned, distinguished and declared to be no authority in that case.

Thorpe v. Railroad (27 Vt. 140), was an action for damages, for killing stock, based upon a violation of a State statute requiring the railroad to have cattle guards at all crossings. The right of the Legislature to enact such a law was discussed, but there was no such ordinance involved in the case, and no discussion as to the power of the municipality to enact an ordinance that would confer a right of private action.

Railroad v. Young (81 Ga. 397), as far as can be gleaned from the report, was a common law action of negligence. On the trial the plaintiff introduced a city ordinance requiring the railroad to keep a flagman at certain crossings and making it his duty to prevent the running of the trains at a greater rate of speed than four miles an hour, and to protect the lives of persons passing along the street. The ordinance provided, also, a punishment for the engineer to run at a greater rate of speed.

There was also a State statute which made it the duty of the railroad, when approaching a street crossing, to ring the bell, and to check the speed of the train, so as to be able to stop the same if there should be anything on the crossing. The court treated the State statute and the city ordinance as of equal dignity, and said they were both referable to the general police powers, but added "that the style of the charge touching the city ordinance was too absolute and unconditional, in treating them as law, without any reference to the jury of the question of fact as to whether there were such ordinances before them, and perhaps as to whether they were reasonable."

Thus it appears that the power of a city to enact such ordinances was assumed, but that the violation of them would not be treated as negligence *per se,* and that the defendant might show that such ordinances were unreasonable. This case is of little value in this State.

Railroad v. Curtis (87 Ga. 416), was an action for

Sluder v. Transit Co.

damages arising out of a violation of an ordinance which prohibited the train, engine or cars to obstruct any street longer than five minutes. The plaintiff's horse became frightened at the engine, and was injured. The trial court instructed that a violation of the ordinance would be negligence as a matter of law, and the Supreme Court said such a violation was negligence *per se*. But the question was not further discussed either upon principle or precedent.

In Railroad v. Stebbing (62 Md. 504), the trial court instructed the jury that a violation of a municipal speed ordinance was negligence *per se*. The Supreme Court held this instruction to be error, and without discussing the power of a city to enact such ordinances, said, "This ordinance is general, and is for the protection of the public generally; but the neglect or disregard of the general duty thereby imposed for the protection of every one, can never become the foundation of a mere personal right of action, until the individual complaining is shown to have been placed in position that gave him particular occasion and right to insist upon the performance of the duty to himself personally. The duty being due to the public, composed of individual persons, each person specially injured by the breach of duty thus imposed, becomes entitled to compensation for such injury. But he must have been in position to entitle him to the protection that the ordinance was designed to afford, and he must show how and under what circumstances the duty arose to him personally, and how it was violated by the negligence of the defendant to his injury." And it was held that the instruction given for the plaintiff was a mere abstraction, and therefore well calculated to mislead; in that, it did not require the jury to find any causal connection between the negligent act in running the train in violation of the ordinance, and the injury complained of. And the court said, "In the abstract form in which the instruction was given, and from the terms

employed, the jury may have inferred that the defendant was liable merely because of the fact that the train was running at forbidden speed, and that such liability was wholly irrespective of any contributory negligence on the part of the plaintiff." And, accordingly, the judgment was reversed for this error.

Correll v. Railroad (38 Ia. 120), was an action for damages, resulting from a violation of a municipal speed ordinance. It was distinctly stated that "the power of the city of Vinton to pass the ordinance is not questioned." The court held that there was no difference between a State statute and a municipal ordinance, and that a violation of the duty imposed by either afforded a right of civil action.

In Railroad v. Hensil (70 Ind. 569), it was said: "The force and effect of a city ordinance regulating the running and management of railroad trains, within the limits of the city, upon a civil action against a railroad company, like the case before us, is a question upon which the authorities are not entirely in accord. But the weight of authority is overwhelmingly to the effect that the failure to perform any duty imposed, either by a statute or an ordinance, is negligence *per se,* and entitles the injured party to recover, provided the failure was a proximate cause of the injury." And Thompson on Negligence, 419 and 1232, and Shearman and Redfield on Negligence, sections 484-5, were cited as authority. The judgment in that case was reversed because of the failure to show that the violation of the ordinance was the proximate cause of the injury.

Railroad v. Reidy (66 Ill. 43), was an action under the State statute which made railroad companies liable for all damages done to stock in any incorporated city where the train was running at a greater rate of speed than the ordinance of the city permitted. As this depended upon the State law, and not upon the validity of a city ordinance, it might be unnecessary to say more of the case, but it is noteworthy that such a viola-

tion is treated as only prima facie evidence of negligence, and not as negligence *per se*.

Mason v. Shawneetown (77 Ill. 533), involved the right of a city to pass an ordinance authorizing the issuance of bonds for the purpose of constructing a levee, and hence is not applicable to the case at bar. It may be noted, however, that the doctrine is laid down in Illinois, that where a city is authorized to pass an ordinance, such ordinance has the same force and effect as a law passed by the Legislature. In other words, the doctrine does not seem to obtain in that State that legislative powers can be delegated to a city.

In Railroad v. Voelker (129 Ill. 540), a recovery was asked for the violation of the statutory duty to ring the bell and sound the whistle, and for a violation of the city speed ordinance, and for common law negligence. The power of a city to enact such ordinances was not discussed, but the case turned upon the contributory negligence of plaintiff. Aside from this, as hereinbefore noted, there is a State statute in Illinois which authorizes a private right of action where a municipal speed ordinance or police regulation governing the running of the railroad trains, has been violated.

Piper v. Railroad (46 N. W. 165), was an action for damages based upon the violation of a State statute regulating the speed of railway trains in cities, and therefore throws no light upon the question here involved, and that question was not discussed in that case.

Railroad v. Terry (42 Tex. 451), was an action for damages for killing the plaintiff's mare and colt, in consequence of running at a greater rate of speed than was permitted by the city ordinance. The right of the city to enact such an ordinance was not raised, discussed or decided in that case.

In Wright v. Railroad (86 Mass. l. c. 290), it was held that in a common law action for negligence, a city ordinance regulating the speed of a street car might be introduced in evidence as bearing upon the question of

the use of due care by the defendant. But the power of a city to enact such an ordinance was not discussed, and the ordinance was not counted upon in that case.

Bott v. Pratt (33 Minn. 323), was an action for damages, caused to the plaintiff by the defendant leaving his horse unhitched in the street, in violation of a city ordinance. The court treated the ordinance as of the same nature and dignity as a State statute, and held that, "The analogy between statutes and the ordinances of cities is, of course, not to be extended beyond the proper limits of municipal jurisdiction. But in matters properly of local cognizance it is necessary and eminently proper that such powers should be committed to the municipality, to be exercised through ordinances which shall be subordinate to and consistent with the general laws, or in proper cases be authorized to take their place." And, therefore, held that a municipal regulation is as binding within the city as any statute or law of the State. And that the Legislature may authorize the city to pass such a law, or may pass it itself.

This case, also, draws the same distinction between ordinances regulating the speed of railroads or other police regulations, and ordinances requiring the owner of the abutting property to remove ice from the sidewalk, as is drawn in the Jackson case.

It is only necessary to say that no such legislative powers can in this State be delegated to a city.

Siemers v. Eisen (54 Cal. 418), was an action for damages caused by the defendant leaving his horse unhitched on the street, in consequence of which, the horse ran away and injured the plaintiff. A city ordinance forbidding the leaving of animals unhitched on the streets was offered in evidence, although the action was not based upon the ordinance. The court discussed the question of the liability of an individual to another for a failure to perform a duty imposed upon him by statute, or through legal authority, and held such a viola-

tion to be negligence in the eye of the law, but the power of a city to enact such an ordinance was not discussed or decided, much less the power of a city, by ordinance, to make evidence of a common or statutory liability.

The foregoing analysis of the cases cited in support of the doctrine laid down in the Jackson case, and in the case at bar, fully demonstrates that such cases arose in States where it is held competent for the legislature to delegate legislative powers to municipalities, or where there was a State statute expressly conferring a right of action upon one citizen against another for a violation of any municipal regulation, or where it was assumed, without discussion, that a private right of action could arise from a violation of a municipal police regulation equally as well as where such right of action was expressly conferred by State statute or by the common law.

Therefore, the prior decisions in this State, and in other jurisdictions, do not accurately, logically and scientifically discuss or decide the questions here involved.

The text-writers have attempted to state a safe legal principle, upon which to rest the decisions on this subject. Thompson on Negligence (2 Ed.), vol. 1, sec. 12, in discussing this question says: "In considering this question, it is further to be kept in mind that there are many statutes and municipal ordinances which forbid the doing of acts, the violation of which does not necessarily give any right of action in favor of private individuals; the offense being against the public, to be redressed in the one case in a criminal prosecution, or in an action brought in behalf of the State by the Attorney-General, and in the other by a prosecution in a municipal court. And it may be stated as a general proposition—though there may be difficulty in some cases in applying it—that the violation of a statute or municipal ordinance is not of itself a cause of action grounded upon negligence in favor of an individual,

unless the statute or ordinance was designed to prevent such injuries as that suffered by the individual claiming the damages, and often not then, the question depending upon judicial theories and surmises.'' The learned author then points out that, although the statute or ordinance may prohibit the doing of an act, to the end of promoting the public safety, such legislation is not exclusive, but that it may be simply declaratory of the common law, and that it is only exclusive where the legislature creates the right or imposes the duty, and gives a remedy, in which event, that remedy alone must be pursued.

The same author in section 4510, vol. 4, cited the rule laid down by this court in Bluedorn v. Railroad (108 Mo. 439), that the violation of a municipal speed ordinance is negligence *per se*, but does not undertake to discuss the question on legal principles.

As hereinbefore pointed out, Dillon on Municipal Corporation, sec. 713, and Redfield on Railways, page 578, discuss only the power of a city to enact a police speed ordinance, but do not discuss the question here involved.

Shearman and Redfield on Negligence (5 Ed.), sec. 13, draws no distinction between a violation of a State statute and a municipal regulation, and advocates the doctrine that they afford a right of action to the citizen injured against the offender, whether the statute or ordinance gives such a right, or simply imposes a penalty by way of fine for its violation. But points out that while this rule obtains on Georgia, Indiana, Missouri, Wisconsin, Minnesota and Colorada, and such violation is in these States treated as negligence *per se*, it is held in New York and Pennsylvania that such violation of a statute or ordinance is not negligence, as a matter of common law, but, ''only some evidence of negligence,'' and concludes that it is wrong to instruct the jury that mere proof of such negligence entitles the plaintiff to recover; or in other words, that it is not negligence

*per se,* but only prima facie evidence.  The author, however, does not discuss the power of a city to create such a private right of action any more than to say that if the statute or city ordinance was established for the benefit of private persons, it would afford such a right of action.

Cooley on Torts (2 Ed.), p. 784, is frequently misquoted as supporting the doctrine stated in the Jackson case and in the case at bar.  An examination of the discussion by that author, beginning on page 780, and extending to page 790, discloses, however, that he was speaking of a violation of a State law and not of a city ordinance, and that he did not consider the question of the power of a city to create such a private right of action under its police power.  The language employed by the author, which has been misapplied is, "If the duty imposed is obviously meant to be a duty to the public, and also to individuals, and the penalty is made payable to the State or to an informer, the right of an individual injured to maintain an action on the case for a breach of the duty owing to him, will be unquestionable."  This language was employed in the paragraph in which it is stated that, "Where the statute imposes a new duty, where none exists before, and gives a specific remedy for its violation, the presumption is that this remedy was meant to be exclusive, and the party complaining of the breach is confined to it."

The author also points out that if a remedy exists at common law, and a new remedy is given by statute, and there are no negative words in the statute, indicating that the new remedy is to be exclusive, the presumption is that it was intended to be cumulative, and the party injured may proceed either under the common law or under the statute.

The foregoing review of the cases in this State and of the adjudications in other States, clearly shows that the distinction made in the Jackson case, between the right of one person to maintain a civil action against

Sluder v. Transit Co.

another for a violation of an ordinance requiring the removal of ice from the sidewalk, and for the violation of a speed ordinance, or such an ordinance as that under consideration in this case, cannot be logically maintained upon legal principles. The power of a city to enact both classes of such ordinances arises out of the police power of the city alone. But it is said in the Jackson case that inasmuch as it is the duty of a city to keep its sidewalks in a reasonably safe condition for the public to travel thereon, and inasmuch as the city cannot shift this responsibility to the abutting owner, or to anyone else, therefore, there is a difference between a violation of an ordinance requiring the abutting owner to remove ice, and an ordinary police speed ordinance, in that, in the former case no right of action is conferred upon third persons, while in the latter case, such a right is conferred.

It is manifest to my mind that the duty of the city is the same in both instances, and that the purpose of the ordinance is the same in both instances.

Permitting the ice to remain on the sidewalk is a nuisance on the public highway. So also permitting a railroad or a citizen to travel at such a rate of speed on the highway as to endanger the safety of other persons thereon, is a nuisance. The liability of the city is the same in both cases. Its liability arises solely from its failure to remove a nuisance from the highway, or from its permitting citizens to create a nuisance on the highway. In the one instance, the nuisance is created by an act of God; in the other instance, it is created by the citizen. And the liability of the city arises solely out of its obligation to keep its highways free of nuisances. The city cannot shift this responsibility in either case, and can shift it as much in the one case as in the other. It has frequently been held, that, under its police power, the city can compel the abutting owner to remove the ice and snow from

the sidewalk; so, also, the city can prevent railroad trains from running on its highways, or from so running as to be a nuisance. The underlying principle, in both instances, is the preservation of the safety of the citizens in using the highway.

I am, therefore, clearly of the opinion, that there can be no accurate, logical or scientific distinction drawn between such ordinances, and therefore that this court must either recede from its opinion in the Norton case, or from the opinion in the Jackson case.

This brings me to a consideration of the other line of cases above referred to, which have run along through the reports of this State at the same time with the cases hereinbefore analyzed.

This line of cases consists of Fath v. Railroad (105 Mo. 545); Senn v. Railroad (108 Mo. 152); Moran v. Pullman Pal. Car Co. (134 Mo. 641); Sanders v. Railroad (147 Mo. 411); Murphy v. Railroad (153 Mo. 252); Holwerson v. Railroad (157 Mo. 245).

And these decisions, in this State, are in harmony with the decisions in other jurisdictions. [Heeney v. Sprague (11 R. I. 456); Railroad v. Ervin (89 Pa. St. 71); Kirby v. Boylston Ass'n (14 Gray 249); Flynn v. Canton Co. (40 Md. 312); Jenks v. Williams (115 Mass. 217); Vandyke v. Cincinnati (1 Disney 532); Knupfle v. Knickerbocker Ice Co. (84 N. Y. 488); Moore v. Gadsden (93 N. Y. 12); Connor v. Electric Traction Co. (173 Pa. St. 602); Railroad v. Dalton (43 S. W. (Ky.) 431); Railroad v. Wood (52 S. W. (Ky.) 796); Atkinson v. Newcastle, etc., Co. (L. R. 2 Exch. Div. 441); Taylor v. Railroad (45 Mich. 74).

In Fath v. Railroad, supra, the question of the power of a city to create "a civil duty, enforceable at common law" was first discussed scientifically in this State, and it was there said, that although the subject had been incidentally touched upon in several instances, the validity of the ordinance had never been adjudicated by this court. And it was there pointed out

that, upon principle and precedent, such a duty could not be created by a mere police regulation, but that the city had power, under its police powers, to create an obligation on the part of its citizens to perform certain of the duties which rested upon the city, and to enforce the performance of such duties by fines, forfeitures and imprisonment, but could not create a right of civil action among citizens *inter sese* for the violation of an ordinance, and that it was only in cases where the defendant had made a contract with the city, for a valuable consideration, to be bound by such regulations, that a civil liability could arise. It was pointed out, exhaustively, that such was the weight of authority in England and America.

The subsequent cases, above referred to, in this State, have followed and amplified the doctrine there laid down.

But it was said in the Jackson case, and is said in the majority opinion in this case, that the discussion of the subject in the Fath case was *obiter,* because in that case it appeared that the defendant had accepted, or agreed to be bound by, the provisions of the ordinance. It is also said in the Jackson case, and in the majority opinion in this case, that the Rhode Island, Pennsylvania, Maryland and Massachusetts cases, above cited, are not decisive of the question here involved, and belong to the same class of cases to which Norton v. St. Louis, supra, belongs, and that they were all cases of violation of a city ordinance requiring the removal of ice and snow from the sidewalk. As hereinbefore pointed out, if the discussion of the subject in Fath v. Railroad was *obiter,* the discussion of the subject in this case is likewise *obiter,* because, in both instances, the defendant had accepted, or agreed to be bound by, the provisions of the ordinance.

But whatever may be said on the question of *obiter,* the fact remains that the legal principles and

precedents referred to, and set out in those cases, must be considered in the final settlement of this case.

Those principles have been fully stated in the Fath case, and the cases before cited which follow it, so that an exhaustive review of those cases is not here necessary. In view, however, of what was said in the Jackson case, and is said in this case, as to the adjudications in other jurisdictions upon this subject, it is necessary to briefly analyze these decisions.

Taylor v. Railroad (45 Mich.) 74), was an action for damages against an abutting owner, arising out of a violation of a city ordinance requiring such owner to remove ice and snow from the sidewalk. The opinion was written by Judge Cooley, and he said, that the plaintiff claimed that the duty imposed was for the benefit of persons using the sidewalk, and enured to each citizen injured, and referred to the fact that the plaintiff relied upon the English case of Couch v. Steel (3 E. & B. 402). The learned judge, however, followed the later English case of Atkinson v. Waterworks Co. (L. R. 2 Exch. Div. 441), and said that, in order to entitle the plaintiff to recover, it must appear that the duty imposed was to individuals rather than to the whole public of the city, for if it was only a public duty, "it cannot be pretended that a private action can be maintained for a breach thereof. A breach of public duty must be punished in some form of public prosecution, and not by way of individual recovery of damages." It was then pointed out, that the duty enjoined was to the whole public, and not to individuals, and it was said, "If the duty to keep sidewalks free from obstructions is a duty to individual travelers desiring to use it, it is as much broken when the walk is wholly obstructed as when it is capable of use but is dangerous, and an action will as much lie by one who is compelled to go around an obstruction, as one who slips and falls in a dangerous place. Moreover, as the lot-owner is required to keep the walk free from all nuisances, an

individual traveler, who can maintain the proposition that this is a duty to him, must be entitled to bring suit whenever the existence of a nuisance diminishes either the comfort or the safety of the use of the walk by him. This view of the obligation of the lot-owner would add greatly to his common-law liabilities, and it is not easy to draw the line which should definitely limit and confine his liabilities." It was accordingly held, that only a public duty was enjoined, and that a right of private action could not arise out of a violation of the duty.

In Knupfle v. Knickerbocker Ice Co. (84 N. Y. 488), it was pointed out that in the earlier New York cases it had been held that a violation of a city speed ordinance, was negligence *per se,* and afforded a right of action to the person injured against the person violating the ordinance, but that the later cases in that State had overruled that doctrine, and held that, the violation of such an ordinance is "some evidence of negligence," and therefore such a violation of such an ordinance did not afford a right of civil action.

Moore v. Gadsden (93 N. Y. 12), was an action for damages against an abutting owner for failure to remove snow and ice from the sidewalk, as required by the city ordinance. The court said, "The ordinance of the city is a police regulation, but is not of itself sufficient to give a cause of action to the party injured by the act in violation of its terms."

Connor v. Electric Traction Co. (173 Pa. St. 602), was an action for damages arising out of a violation of a city ordinance regulating the running of street cars. It was contended that a violation of the ordinance was negligence, *per se,* but the Supreme Court said, "Failure to comply with the provisions of such an ordinance, is not necessarily negligence *per se;* it is merely evidence of negligence."

Jenks v. Williams (115 Mass. 217), was a bill in equity to enjoin the owner from constructing or main-

taining bow-windows, or other projections into the street, contrary to the city ordinance; in consequence of which the plaintiff's adjoining property was diminished in value. It was held that the ordinance was intended for the benefit of the public, and conferred no distinct rights on individual citizens or owners of · property, and that a private action would not lie for the violation of the ordinance.

Heeney v. Sprague (11 R. I. 456), was an action for damages, arising out of the violation of a municipal ordinance requiring the abutting owner to remove snow and ice from the sidewalk. The subject is discussed with such clearness and force, by Chief Justice Durfee, that the following excerpt therefrom is justified. He said: "The plaintiffs base their right to maintain this action on the authority of cases which, they claim, hold that where a person is required by statute to do an act and neglects to do it, any person specially injured by the neglect is entitled to recover his damages in an action on the case, if no other remedy is given, and that, too, even when the statute imposes a penalty for its violation. [Couch v. Steel (3 E. & B. 402, 411); Gen. Steam Nav. Co. v. Morrison (13 C. B. N. S. 581, 594); Caswell v. Worth (5 E. & B. 849); Atkinson v. Newcastle, etc. Co. (L. R. 2 Exch. Div. 441); Aldrich v. Howard (7 R. I. 199).] It has been doubted, however, whether the cases go so far as is claimed. This doubt is expressed in Flynn v. Canton Co. of Baltimore (40 Md. 312), and in that case the attempt is made to confine the liability to cases in which the neglected duty is prescribed for the benefit of particular persons, or of a particular class of persons, or in consideration of some emolument or privilege conferred, or provision made, for its performance, and to show that it does not extend to a duty imposed without consideration, and for the benefit of the public at large—the only liability for the neglect of such a duty being the penalty prescribed. And this

view is supported by strong, if not irrefragable authority. [Hickok v. Trustees of Plattsburgh (16 N. Y., note on p, 161); Eastman v. Meredith (36 N. H. 284); Bigelow v. Inhabitants of Randolph (14 Gray 541); Aldrich v. Tripp (*ante,* p. 141).] But even supposing the liability is not subject to any such qualification, then, inasmuch as the neglected duty was not enjoined by statute but by a municipal ordinance, the question arises whether in this respect an ordinance is as effectual as a statute. There are many things forbidden by ordinance which are nuisances or torts, and actionable as such at common law. The question does not relate to them. The defendant has not done anything injurious to others which she was forbidden to do; she has simply left undone something beneficial to others which she was required to do under a penalty in case of default. The thing required was not obligatory upon her at common law. It was a duty newly created by ordinance, which, but for the ordinance, she might have omitted with entire impunity. The question is, whether a person neglecting such a duty is subject, not only to the penalty prescribed, but also to a civil action in favor of any person specially injured by the neglect. If the liability exists, it is quite a formidable one. A fall on the ice is often serious in its consequences. The damages resulting from it may amount to thousands of dollars. And under the ordinance the liability, if it exists, may be visited either upon the owner or the occupant of the abutting premises, or upon any person having the care of them. And further, if the liability exists under the ordinance in question, it exists, *pari ratione,* under every ordinance prescribing a similar duty. To hold that it exists is therefore to recognize, outside the Legislature, a legislative power as between individuals which, though indirectly exercised, is nevertheless, in a high degree, delicate and important. This we ought not to do, unless upon principle or precedent our duty

to do it is clear; for we do not suppose that the creation of new civil liabilities between individuals was any part of the object for which the power to enact ordinances was granted.

"In some of the cases the origin of the liability upon a statutory duty is ascribed to the statute of Westminster II., cap. 50; 2 Inst. 485, 486. See Couch v. Steel (3 E. & B. 402, 411); Aldrich v. Howard (7 R. I. 199, 214). This chapter, however, relates only to statutes; it does not extend to municipal ordinances. But even if the liability has its origin in the common law, we do not find that it has ever been held to extend to a neglect of duty enjoined simply by a municipal ordinance, and we think there are reasons, apparent from what we have already said, why it should not extend to it. The power to enact ordinances is granted for particular local purposes. It includes or is coupled with a power to prescribe limited punishments by fine, penalty, or imprisonment for disobedience. No power is given to annex any civil liability. The power, being delegated, should be strictly construed. It would seem, therefore, that the mere neglect of a duty prescribed in the exercise of such a power should not be held to create, as a legal consequence, a liability which, within the power, could not be directly imposed."

It will be observed that the court discussed the whole subject of the power of a city to enact such police regulations and of the right of citizens to maintain an action for the violation thereof. No distinction is made, in the discussion, between municipal ordinances requiring the abutting owner to remove ice and snow from the sidewalk and municipal ordinances regulating the use of streets or the running of trains, or the driving of vehicles on the streets. And the difference is pointed out between ordinances which are intended for the benefit of the whole community, or of all persons composing the community, and ordinances which are passed for the benefit of particular persons, or a

particular class of persons, or in consideration of some emolument or privilege conferred. It is obvious that speed ordinances, or ordinances like the Vigilant Watch Ordinance, are passed as much for the benefit of the whole public, as are ordinances for the removal of ice and snow from the sidewalk, and that neither class of ordinances can accurately be said to have been passed for the benefit of particular persons or classes of persons.

Railroad v. Ervin (89 Pa. St. 71), was an action for damages growing out of a failure of the railroad company to obey a municipal ordinance which required it to place a cap-log eight inches high on the side of the wharf or passageway, in consequence of which, the plaintiff's horse and cart fell into the river and were lost. The court held that no right of action was conferred in favor of the plaintiff by the ordinance, and that as no right of action, at common law, existed, the plaintiff was not entitled to recover. Speaking of such ordinances the court said, "Would disobedience of this regulation, of itself, subject the company to such charge and action? This question would seem almost to answer itself; for if it be affirmed, then may civil duties and civil remedies be given or taken away by ordinances; a power as yet quite beyond the reach of municipal legislation. The national or State Legislature may do this, for it is the supreme power, and as such can make that immoral which was before indifferent, and that neglect which was before prudence, but the city of Philadelphia has no such power. Its ordinances are but police regulations enforceable by penalties, recoverable by actions of debt or otherwise as may be prescribed, but if not so enforced, they come to nothing. An ordinance may forbid the maintenance, by my neighbor, of a cess-pool upon his premises, and it may, by penalty, compel him to abate it, but whether it does so or not, I may, if I am damaged thereby, have my common law action against him, but if I am not dam-

aged I am without remedy; in this the ordinance neither helps nor hinders.   This is a matter well settled by Spencer, J., in the case of Vandyke v. The City of Cincinnati (1 Disney's Rep. 532), thus: 'I conclude, then, that the ordinance imposed upon Harbeson a public duty alone, which can only be enforced by a penalty prescribed, and non-performance of which does not subject him to a civil action at the suit of a person injured.'   In arriving at this conclusion the learned justice uses the argument I have thought proper to adopt; that is, an ordinance cannot create a civil duty enforceable at common law.   For if a city council has power so to do—if it has the power to create such obligation, it must also have the power to restrict it, in other words, to prescribe the sole consequences arising therefrom, but it will, we apprehend, be conceded that a power, like the one here indicated, is wholly beyond the provisions of such a body.   There are indeed cases where such ordinances have been received in evidence in common law actions for negligence, but they are generally such as enter into the case itself, or enforce a common law duty.''

The case of Vandyke v. Cincinnati (1 Disney 532), referred to in the case last analyzed, discusses the question here involved and holds that a civil right of action cannot arise out of such an ordinance, saying, ''The effect of this would be to invest a municipal corporation with the highest attribute of sovereignty, that of creating, limiting, and directing the most important rights and interests of individuals in the community, and dictating their relation to each other; a power that no legislature, under our constitution, can depute to, or confer upon another.   I conclude, then, that the ordinance imposed upon Harbeson a duty to the public alone, which can only be enforced by the penalty prescribed; and the non-performance of which does not subject him to a civil action, at the suit of a private person.''

Kirby v. Boylston Market Co. (80 Mass. 249), was an action for damages for personal injury received by the plaintiff from falling on the sidewalk in front of the plaintiff's market house in Boston. It was held that individuals, who sustain injuries from nuisances created or obstructions unlawfully placed by another person in the public highway, may maintain an action against him to recover compensation therefor, independent of any statute or ordinance, but that an abutting owner cannot be made liable to a personal action by the party injured because of the failure to obey a municipal ordinance requiring such abutting owner to remove ice and snow from the sidewallk; and that the person violating such ordinance is subject to presecution under the ordinance alone.

Railroad v. Dalton (43 S. W. (Ky.) 431), was an action for damages based, partly, upon a violation of a municipal speed ordinance. The court reviewed the prior decisions in that State, which held that a violation of such a speed ordinance could not afford a civil right of action, and which further held, that such ordinances were not competent evidence of common-law negligence, and also reviewed some of the decisions in other States, and said: "Without attempting to harmonize these apparently conflicting authorities, the true rule seems to us to be that announced by the Superior Court. There can be no recovery of damages in this State against railroad companies in cases of this kind, except because of neligence. This is a question of fact to be established by proof. Negligence cannot be fastened on the carrier by some local police regulation. Punishment may be imposed for violation of such ordinances, but in civil suits there are well-defined methods of establishing the facts which authorize a recovery, and we cannot depart from this method without doing violence to well-settled principles." And speaking of such ordinances being used as evidence of common law negligence, the court said, "It

would seem clear that the introduction of the ordinance could serve no purpose save almost necessarily to mislead the jury.''

Railroad v. Wood (52 S. W. (Ky.) 796), was an action for damages for the killing of plaintiff's horses. The action was based upon a violation of a city ordinance limiting the speed of the train. The court said, ''In our opinion, the court erred in admitting the ordinance in evidence. It was essential, in order to recover, that the negligence of the appellant be established independent of the fact that the ordinance prohibited the running of trains through the streets of the city at a greater rate of speed than twelve miles an hour. This is no longer an open question in Kentucky, as it was adjudged in Railroad v. Dalton (43 S. W. (Ky.) 431), that such an ordinance is not admissible as evidence upon the trial of a case like the one under consideration, and is misleading and prejudicial to the rights of the defendant. To the same effect is Dolfinger v. Fishback (12 Bush 474).''

Flynn v. Canton Co. (40 Md. 312), was an action for damages growing out of a violation of a municipal ordinance requiring the abutting owner to remove ice from the sidewalk. The court reviewed the former decisions in that State, and also reviewed at length the cases of Couch v. Steel (3 E. B. 402), and Atkinson v. Waterworks Co. (L. R. 2 Exch. Div. 441), and pointed out the difference between a law which is enacted for the benefit of particular individuals or a particular class of individuals, e. g., the act of parliament requiring shipowners to furnish a sufficient supply of medicine, which was involved in Couch v. Steel, supra, and a law that was enacted for the benefit of the whole community, such as was involved in Atkinson v. Waterworks Co., supra, and held that a civil right of action enures to the individual damaged by the violation of the first class, but that such a right of action does not enure to any individual in the second class, and the

violation of such a law can only be punishable by fine and penalty.

I believe that this is the true distinction as to State laws, and I further believe that, under the Constitution and decisions in this State, the power to enact such laws is vested solely in the Legislature, and that the delegation to a municipality of a police power does not confer upon it the right to create a right of civil action, but that this right is limited to forbidding such acts or offenses, and to punishing them by fine, forfeiture and imprisonment. This view is clearly within the rule laid down by Lord CAIRNS in Atkinson v. Waterworks Co., supra, where he said, "But I must venture, with great respect to the learned judges who decided that case, and particularly to Lord CAMPBELL, to express grave doubts whether the authorities cited by Lord CAMPBELL justify the broad general proposition that appears to have been there laid down—that, where a statutory duty is created, any person, who can show that he has sustained injuries from the non-performance of that duty, can bring an action for damages against the person on whom the duty is imposed. I cannot but think that that must, to a great extent, depend on the purview of the Legislature in the particular statute, and the language which they have there employed."

This doctrine, read in connection with the doctrine which obtains in this State, that the legislative power cannot be delegated to a municipality, in my judgment, solves the question under discussion here.

If a violation of mere police regulations of a city can confer a right of action among citizens *inter sese,* the result would be that a citizen in a city would have a right of action against another citizen of the city, while a resident of any part of the State outside of such city would not have a right of action against another resident of such part of the State for the neglect

of a' duty that resulted in the same character of injury to the other person.

This would make the law different in a city from what it is in the country. The law would not be uniform throughout the State, and hence, under the decision in Badgley v. St. Louis, supra, such city law would be unconstitutional.

Again, if a city has the power to create such a right of action among citizens, it has the right to prescribe how much the person injured by its violation shall recover from the offender. Under such a power St. Louis might provide for a recovery of ten thousand dollars, Kansas City for a recovery of five thousand dollars, and Cedar City for a recovery of twenty-five thousand dollars. So that the law would be different in the several cities of the State, and outside of the cities the resident of the country would have no such law for his protection. Laws cannot be so localized or so differ...nt in the different parts of the State.

### III.

If the city has such a power, under its charter, has it enacted any such law, or has it simply enacted police regulations, and prescribed penalties for the violation thereof, and are such penalties the sole remedy afforded by this regulation, and have the courts the right to punish the offender in any other manner than is prescribed by such regulation?

The Vigilant Watch Ordinance here involved is one of the twelve provisions contained in section 1760, article 6, chapter 23, of the municipal code of St. Louis. Section 1772 of the same article provides that any person, corporation, company, etc., violating, or failing to comply with, any of the provisions of that article, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than $5, nor more than $500.

Bearing in mind the provisions of paragraph 14

of section 26 of article 3 of the city charter, which limit the right of the city to enforce the police regulations it may enact, by fines and penalties, not exceeding $500, and by forfeitures, not exceeding $1,000, and bearing in mind the penalty prescribed by section 1772, aforesaid, the question here involved must be solved. It is perfectly obvious that in enacting the Vigilant Watch Ordinance, or regulation, the municipal assembly was proceeding under the power conferred by the charter aforesaid, and that it was simply attempting to pass a general police regulation that would regulate the duty of all persons, corporations and companies, with respect to the whole body of citizens, and was not undertaking to pass any ordinance that would enure to the benefit of any particular individual, or any particular class of individuals. In other words, the city was exercising its delegated police power, and did not, and did not attempt to, create any right of civil action between citizens *inter sese*, but intended that any person violating any of the police regulations contemplated by said article, should be guilty of a misdemeanor, and upon conviction, be fined not less than $5 nor more than $500.

In my judgment no other penalty or liability can attach to, or arise out of, a violation of such ordinance. From time immemorial the general and better rule of law has been that where a new duty is imposed, and the act imposing it prescribes a specific punishment for its violation, no other punishment can be inflicted therefor, and the courts have no power to enlarge, alter or change the punishment prescribed.

King v. Marriott (4 Modern Rep. 144), was an indictment against the defendant for keeping an alehouse without a license. The statute prescribed that no person should keep an alehouse, but such who shall be admitted thereto, under a penalty of three days imprisonment, without bail, and not to be discharged without giving a recognizance with two sureties to do so no

more.  It was objected that an indictment would not lie, because the offense was not a common law offense, but a new duty imposed by statute, and that the statute prescribed the offense should be prosecuted by information, and that an indictment was not provided by the statute.  It was there said: "Now, where a law makes an offense, and points out the method of prosecution, it must be punished according to such method, and not otherwise;" and accordingly the indictment was quashed.  The same ruling was made in Stephens v. Watson (1 Salk. 45); Rex v. Pensax (1 Bar. K. B. 127); and Rex v. Wright (1 Burr. 544). In Hartley v. Hooker (Cowper 524), it was held that, "Wherever a new offense is created by statute, and a special jurisdiction out of the course of common law is prescribed, that special jurisdiction must be strictly followed, or all the proceedings will be a nullity."

Sutherland on Statutory Construction, sec. 208, lays down the rule that, "When a law imposes a punishment which acts upon the offender alone, and not as a reparation to the party injured, and where it is entirely within the discretion of the law-giver, it will not be presumed that he intended that it should extend further than is expressed; and humanity would require that it should be so limited."

Sedgwick's Statutory and Constitutional Law (2 Ed.), p. 341, says, "Where a precise remedy for the violation of a right is provided by statute, it often becomes a matter of interest to know whether the statutory remedy is the only one that can be had, or whether it is to be regarded as merely cumulative, the party aggrieved having also a right to resort to his redress for the injury sustained, at common law, or independent of the statute.  In regard to this we have already noticed the rule that where a statute does not vest a right in the person, but only prohibits the doing of some act under a penalty, in such a case the party violating the statute is liable to the penalty only; but where a

right of property is vested by virtue of the statute, it may be vindicated by the common law, unless the statute confines the remedy to the penalty.''

The same author, at page 343, says, ''But on the other hand, it is a rule of great importance, and frequently acted upon, that where by a statute a new right is given and a specific remedy provided for a new power and also the means of executing it are provided by statute, the power can be executed and the right vindicated in no other way than that prescribed by statute.''

Endlich on Interpretation of Statutes, sec. 465, says, ''If the statute which creates the obligation, whether public or private, provides in the same section or passage a specific means of procedure for enforcing it, no other course than that provided for can be resorted to for that purpose.''

Smith on the Modern Law of Municipal Corporations, vol. 1, sec. 547, thus states the rule: ''If the manner of enforcing ordinances is prescribed by statute or charter it is a cardinal rule that no other method can be resorted to.'' And in support of the text the author cites: Eubanks v. President (36 Ill. 177); King v. President (31 Ill. 305); Israel v. President (2 Ill. 290); Weeks v. Forman (16 N. J. L. 237); Williamson v. Commonwealth (4 B. Mon. (Ky.) 146); State v. Zeigler (32 N. J. L. 262); Hart v. Mayor (9 Wend. (N. Y.) 571); Mayor v. Murphy (40 N. J. L. 145); City Council v. Ashley Co. (34 S. C. 541); Santa Cruz v. Railroad (56 Cal. 143).

This is the rule that has obtained in this State ever since the case of Riddick v. Governor (1 Mo. 147), was decided. In that case it was said, ''It is an incontrovertible maxim of law, that a statute imposing a penalty for a new-created offense, or for a breach of duty, and defining the particular mode in which, and before what tribunal the penalty shall be recoverable, must be strictly pursued.''

The court then pointed out that the act under consideration imposed a new duty upon sheriffs, and prescribed a penalty for its violation, and the method to be pursued to impose such penalty, and the tribunal to try the cause, and said, "We are at once led to the conclusion that they [the law makers] intended to provide, specifically, an adequate remedy for the neglect of each particular duty thereby created; and a different construction would subject the sheriff to a liability which we cannot reasonably suppose he ever intended to incur." This rule was followed in Ellis v. Whitlock (10 Mo. 781); State v. Canton (43 Mo. 51); Moore v. White (45 Mo. 206); Parish v. Railroad (63 Mo. l. c. 286); Railroad v. Railroad (149 Mo. l. c. 253); Fusz v. Spaunhorst (67 Mo. l. c. 264).

The first canon of construction of a statutory law is, that, "An affirmative enactment of a new rule implies a negative of whatever is not included, or is different; and if by the language used a thing is limited to be done in the particular form or manner, it includes a negative that it shall not be done otherwise." [Ex parte Joffee (46 Mo. App. l. c. 365); Sutherland on Stat. Const. (sec. 140); Wells v. Supervisors (102 U. S. 625); Cooley's Const. Lim., pp. 78, 79, 93, 94.] To the same effect is Elliott on Railroads, sec. 711.

The same rule obtains in other jurisdictions. In City of Rochester v. Campbell (123 N. Y. l. c. 414), the Court of Appeals said: "It is a familiar rule in the construction of statutes that where a new right is created, or a new duty imposed by statute, if a remedy be given by the same statute for its violation or nonperformance, the remedy given is exclusive."

The Am. and Eng. Ency. of Law (2 Ed.), vol. 26, p. 658, thus states the rule: "It is a well-settled rule of law that penal statutes are to be construed strictly. This rule is said to be founded on the tenderness of the law for the rights of individuals and on the plain principle that the power of punishment is vested in the

Legislature, not in the judicial department. . . . The rule under consideration applies to all statutes which impose, as a punishment, any penalties, pecuniary or otherwise, or forfeiture of money or other property, or of vested rights, or provide for the recovery of damages beyond just compensation to the party injured, whether such penalties, forfeitures, or damages are to be enforced. and recovered at the suit of the State or of the private individual.''

The same author, at page 671, says: . ''A statute instituting a new remedy for an existing right does not take away a pre-existing remedy without express words or· necessary implication; the new remedy is cumulative, and either may be pursued. But when a statute gives a right or remedy which did not exist at common law, and provides a specific method of enforcing it, the mode of procedure provided by the statute is exclusive and must be strictly pursued.''

To my mind the city ordinance, section 1760, which regulates the speed of cars, and includes what is called the Vigilant Watch Ordinance, imposes a new duty outside of the requirement of the common law, and is much more stringent than the common law. It cannot, therefore, be said that the Vigilant Watch Ordinance is simply declaratory of the common law, and, therefore, affords an additional remedy to that afforded by the common law. The ordinance is a penal ordinance creating new duties of a general nature, applicable to all of the citizens of St. Louis and not intended for the benefit of any particular individual, or particular class of individuals. The ordinance prescribes the only penalty which the charter of St. Louis authorizes the municipal assembly to provide for the violation thereof. There is nothing in the letter, the spirit or the context of the ordinance, which furnishes any color to the claim that the city intended to confer a private right of civil action for a violation of it.

It is strictly and truly a police regulation, intended for the government of street railroads, in their relation to the city, and to the whole body of citizens, and carries with it its own punishment for the violation of it. The courts cannot vary, enlarge, extend, modify, or in any manner change, the specific penalty prescribed by the ordinance for the violation thereof.

For the foregoing reasons I am unable to concur in the majority opinion in respect to the matters herein discussed. It is a matter of sincere regret to me, in every instance, when I feel compelled to disagree with my brother judges upon questions of law. I have great respect for the doctrine of "*stare decisis*," but I have greater respect for the fundamental principles of law, and where no property rights are concerned, I think error never can become right, however long it may have existed and been followed.

The principles of law are founded upon the truest sense of right and wrong, and error is incompatible with right. As herein indicated, I believe this is the first time the questions herein discussed have been thoroughly considered on legal principles and according to the science of law, in this State. And because the opinion in this case will foreclose further discussion of those questions, at any rate, during the time I will have the honor to be a member of this court, I have felt constrained, once for all, to examine at such great length, and with all the care and skill I possess, the authorities and decisions bearing on this question, and to announce my conviction, that the rule laid down by the majority opinion in this case will enlarge the rights of municipalities and of citizens *inter sese,* and produce much litigation that is wholly beyond the contemplation of the common law and the statutes of this State.

With the greatest respect and best feeling for my brother judges who have reached a different conclusion, I express the foregoing as my deep-seated conviction of the right concerning the questions discussed.